**Christine L. CARL, et al., Plaintiff,**

v.

**Ron ANGELONE, Defendant.**

**No. CV–N–93–626–ECR.**

United States District Court,
D. Nevada.

April 19, 1995.

Norah Ann McCoy, Carson City, NV, for plaintiff.

Gerald E. Weis, Office of the Atty. Gen., Carson City, NV, for defendant.

### ORDER

EDWARD C. REED, Jr., District Judge.

Now before the Court is defendant Ron Angelone's motion for summary judgment (Doc. # 25) based on qualified immunity. The motion is opposed (Doc. # 29) and a reply (Doc. # 30) has been filed.

### SUMMARY JUDGMENT STANDARD

■ The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975). The moving party is entitled to summary judgment as a matter of law where, viewing the evidence and the inferences arising therefrom in favor of the nonmovant, there are no genuine issues of material fact in dispute. Fed. R.Civ.P. 56(c); *Semegen v. Weidner*, 780 F.2d 727 (9th Cir.1985). Where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See v. Durang*, 711 F.2d 141 (9th Cir.1983).

■ The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ In evaluating the appropriateness of summary judgment, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) considering that evidence in light of the appropriate standard of proof. *Anderson, supra.* As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248, 106 S.Ct. at 2510. Where there is a complete failure of proof concerning an essential element of the nonmoving party's case, all other facts are rendered immaterial, and the moving party is entitled to judgment as a matter of law. *Celotex, supra.*

■ Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules as a whole. *Id.* When faced with a motion for summary judgment, the material before the court "must be viewed in the light most favorable to the [non-moving] party." *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

## DISCUSSION

Defendant, Mr. Angelone is the director of the Nevada Department of Prisons (NDOP). Plaintiffs are Correctional Officers (C/Os) within NDOP. They allege that Mr. Angelone intentionally discriminated against them on the basis of their gender.

Plaintiffs allege that Mr. Angelone transferred plaintiff male C/Os out of two women's correctional facilities and transferred plaintiff female C/Os from other correctional facilities to fill the vacancies. Mr. Angelone concedes that he did this and that he did so based on the plaintiff's gender: i.e. Mr. Angelone admits he made the transfers because he wanted female correctional officers at the women's correctional facilities and therefore transferred the male officers out because they were men and transferred the female officers in because they were women.

■ Qualified immunity protects government officials from civil liability for actions taken in the performance of discretionary functions when their actions do not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). However,

> [n]o official can in good faith impose discriminatory burdens on a person or group by reason of a racial or ethnic animus against them. The constitutional right to be free from such invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it.

*Flores v. Pierce,* 617 F.2d 1386, 1392 (9th Cir.) *cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980). The same is true for sex or gender based discrimination in employment. 42 U.S.C. § 2000e.

## A. QUALIFIED IMMUNITY IS UNAVAILABLE IN CASES OF INTENTIONAL DISCRIMINATION

■ In cases involving intentional discrimination, the qualified immunity defense and the dispositive issue of the defendant's intent merge.

> If the plaintiff fails to establish that the discrimination was intentional, the claim fails. If the plaintiff does establish such intent, there can be no qualified immunity. Thus, it seems simpler to say that qualified immunity is not a defense in such cases, rather than that the defense prevails where proof of intentional discrimination is not established.

*Gutierrez v. Mun. Ct. of S.E. Judicial Dist.,* 838 F.2d 1031, 1051 n. 29 (9th Cir.1988) *cert. granted,* and *j'ment vacated as moot* by 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989). *See also Lindsey v. Shalmy,* 29 F.3d 1382, 1384–85 (9th Cir.1994); *Branch v. Tunnell,* 937 F.2d 1382, 1385 (9th Cir.1991); *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1040 (9th Cir.1990) *cert. denied,* 502 U.S. 957, 112 S.Ct. 417, 116 L.Ed.2d 437 (1991).

■ A heightened proof standard applies. *Lindsey v. Shalmy,* 29 F.3d at 1385. Absent "sufficient 'direct or circumstantial evidence' of intent, . . . to create a genuine issue of fact for the jury" the Court should grant Mr. Angelone's motion for summary judgment. *Id.* If there is sufficient evidence of intent to discriminate against plaintiffs because of their gender, then Mr. Angelone's motion should be denied.

There is substantial evidence that the sole motivating factor for Mr. Angelone's actions was the gender of each of the individual plaintiffs. Mr. Angelone not only admits this, but affirmatively claims that he took the challenged actions solely on the basis of gender. Mr. Angelone contends that because he thought his actions were legal and appropriate responses to *Jordan v. Gardner,* 986 F.2d 1521 (9th Cir.1993), his actions were non-discriminatory. *See* motion (Doc. # 25) p. 9, ln. 20 to p. 10 ln. 10.

Mr. Angelone's belief that his actions were legal and appropriate in light of *Jordan* does not remove discriminatory intent from his actions. This raises the affirmative defense of bona fide occupational qualification (bfoq) in which a defendant admits the discriminatory intent motivating the actions, but claims that such actions were otherwise necessary and thus excepted from prohibition. *See* 42 U.S.C. § 2000e–2(e); *International Union, UAW v. Johnson Controls,* 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991) (discussing differences between business necessity and bfoq employer defenses, and that bfoq applies to facially discriminatory policies but not to neutral policies with discriminatory effects).

Not only is summary judgment on the basis of qualified immunity not possible, summary judgment in favor of plaintiffs would be appropriate absent Mr. Angelone's affirmative defense of bfoq. There is no genuine issue regarding Mr. Angelone's discriminatory intent or his actions. The only issues remaining for determination revolve around the claimed bfoq defense.

## B. BONA FIDE OCCUPATIONAL QUALIFICATION

The Court has already denied a defense motion for summary judgment based on the claimed bfoq. Order (Doc. # 21).

What the Court has not ruled on, and what is the unstated basis for Mr. Angelone's instant motion for summary judgment is the applicability of qualified immunity to a public officer's use of the bfoq doctrine to justify discriminatory actions.

Although not phrased in so many words, Mr. Angelone's instant motion for summary judgment argues that he is entitled to qualified immunity because the bfoq exception to Title VII, 42 U.S.C. § 2000e–2(e)(1), is not clearly established. Alternatively, if it is well established, that a reasonable officer in Mr. Angelone's place could nevertheless have believed his actions were entitled to bfoq exemption from Title VII prohibition and therefore he could have reasonably believed his actions did not violate the plaintiffs' rights.

This is a novel question. So far as the Court is aware, there is no reported case in which a defendant has claimed qualified immunity based on that defendant's invoking a bfoq exception to justify otherwise illegal discriminatory actions.

■■ The Court believes it is not possible to base a qualified good faith immunity claim on the assertion of a bfoq.

The bfoq is an affirmative defense in itself. To allow defendants to elevate it into a qualified immunity appears improper for several reasons. First, the bfoq is an affirmative defense to liability. No good reason is presented why qualified immunity should flow from the assertion from an affirmative defense on which defendant has the burden of proof. This would in essence reverse the burden of proof, requiring plaintiff to demonstrate that defendant could not have reasonably believed the bfoq defense applied, even though defendant would bear the burden of proving the bfoq defense.

Further, allowing qualified immunity to be based on the assertion of a bfoq defense might contradict Congressional intent. Allowing good faith immunity to be based on assertion of the bfoq defense might impermissibly increase the narrow exception Congress intended when it enacted the bfoq provisions. *See International Union, UAW v. Johnson Controls,* 499 U.S. 187, 201, 111 S.Ct. 1196, 1204–05, 113 L.Ed.2d 158 (1991) (noting that the emphasis on the restrictive scope of the bfoq defense is grounded in both the language and legislative history of § 703 of Title VII).

### 1. Standards and Methods for Invoking the BFOQ Exception

Title 42 U.S.C. § 2000e–2(e) provides, in part, that

> [n]otwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees ... or for an employer ... to admit or employ any individual ... on the basis of ... sex ... in those certain instances where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal opera-

tion of that particular business or enterprise. . . .

■ Where discrimination is on the basis of gender, the employer bears the burden of proving:

1) that the job qualification or function justifying the discrimination is reasonably necessary to the essence of the defendant's particular business; and

2) that gender is a legitimate proxy for the qualification or function because

(a) there is a substantial basis for believing that all or nearly all employees of the affected gender lack the qualification or ability to perform that function, or

(b) it is impossible or highly impractical for the defendant to insure by individual testing that its employees will have the necessary qualifications for the job.

See E.E.O.C. v. Boeing Co., 843 F.2d 1213, 1214 (9th Cir.) cert. denied, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988); Harriss v. Pan American World Airways, Inc., 649 F.2d 670 (9th Cir.1980).

■ A defendant prison must

demonstrate why it cannot reasonably rearrange job responsibilities within the prison in order to minimize the clash between privacy interests of the inmates and the safety of the prison employees on the one hand and the non-discrimination requirement of Title VII on the other[,]

before the prison will be entitled to the bfoq exception. United States v. Gregory, 818 F.2d 1114, 1118 (4th Cir.) cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987), citing Gunther v. Iowa State Men's Reformatory, 612 F.2d 1079 (8th Cir.) cert. denied, 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980); see Jordan v. Gardner, 986 F.2d 1521, 1527 (9th Cir.1993) citing Gunther with approval, but also noting that is was overruled on other grounds, by Kremer v. Chemical Constr. Corp., 456 U.S. 461, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982).

■ The bfoq exception is an affirmative defense; the burden of pleading and proof it is placed on the defendant.

## 2. Standards and Methods for Invoking Qualified Immunity

■ In the normal case, the plaintiff alleges the actions of a defendant violated certain of the plaintiff's rights. The defendant then asserts qualified immunity. This brings the qualified immunity claim to issue and a two prong test is employed to determine whether the defendant official is entitled to immunity. First, the plaintiff bears the initial burden of establishing that the rights allegedly violated were clearly established at the time of defendant's actions. Neely v. Feinstein, 50 F.3d 1502, 1507, 1508–09 (9th Cir.1995); Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir.1994); Armendariz v. Penman, 31 F.3d 860, 869 (9th Cir.1994) reh'g en banc granted by, 41 F.3d 493 (1994); see Elder v. Holloway, 975 F.2d 1388, 1392 (9th Cir.1991) rev'd on other grounds —— U.S. ——, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (outlining the extent of the plaintiff's "burden" of establishing the law was clearly established).

If the plaintiff fails to carry this initial burden, the defendant is entitled to immunity. If the plaintiff carries this burden, the defendant is entitled to immunity only by demonstrating that a reasonable official in the defendant's position could have believed the challenged conduct did not violate a constitutional or statutory right. Neely, 50 F.3d at 1509; Gasho, 39 F.3d at 1438; Armendariz, 31 F.3d at 869.

Qualified immunity, a hybrid species of affirmative defense and immunity, places the initial burden on the plaintiff to prove that the right allegedly violated was clearly established.

## 3. Qualified Immunity Cannot be Based on a Claimed bfoq

The qualified immunity framework makes sense, because the plaintiff, master of her complaint, chooses which rights to claim were violated. Furthermore, the plaintiff bears the burden of proving the violation of these rights. Thus, plaintiff should have the initial burden of establishing that those rights the defendant allegedly violated were in fact clearly established. Last, this is a form of immunity from suit; therefore, the defendant should not have the burden of proving its application, but the plaintiff should have the

burden of proving its non-application. *See Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984) (competing interests are best balanced with objective test because officials can act without fear of harassing litigation only if they reasonably can anticipate when their ·conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated).

The bfoq exception is an affirmative defense. The defendant bears the burden of proof and chooses how to plead it. It makes no sense to impose the initial burden on the plaintiff. This would require the plaintiff to anticipate the defendant's theory and the legal authority upon which that theory relies. The initial burden should be placed on the defendant to articulate the bfoq which makes the challenged conduct legal, despite the defendant's discriminatory intent.

A further, practical problem arises. It appears to the Court that any attempt to graft qualified immunity onto the bfoq affirmative defense will result in a nullity: the derivative qualified immunity claim offers no greater protection to government officers than the substantive bfoq defense itself.

The ultimate question in any such claim of qualified immunity is not whether the bfoq defense is applicable or not, but whether a reasonable officer could have believed the bfoq defense applied and permitted the discriminatory action taken. This will present a genuine issue of fact to be decided at trial nearly as often as the substantive bfoq defense itself. In other words, a qualified immunity claim based on assertion of the bfoq defense will provide no, or only marginally, greater protection than the substantive bfoq defense itself.

The problem is that the qualified immunity analysis collapses in on and becomes merged with the bfoq analysis. When considering a qualified immunity claim based on the bfoq defense, the Court determines whether the evidence establishes that a reasonable officer could have believed the elements of the bfoq defense were satisfied. When considering the bfoq defense itself, the question is wheth-er the evidence establishes that the elements of the bfoq defense are actually satisfied.

This Court is incapable of deriving a principled basis for determining when a genuine issue might remain regarding the substantive elements of a bfoq defense yet a reasonable officer could nevertheless believe those elements satisfied. If a genuine question of fact remains on an element of the bfoq defense, the court must conclude that a genuine question of fact remains, regarding whether a reasonable officer could have thought that element satisfied. Even though the qualified immunity analysis must be less rigorous than the substantive bfoq analysis, the Court cannot devise a test reflecting that less rigorous analysis.

For all these reasons, the Court holds that a claim of qualified good faith immunity cannot be · based on the assertion of a bfoq affirmative defense.

Rather than denying Mr. Angelone's motion for summary judgment on the sole basis that qualified immunity is simply inapplicable the Court further addresses the merits of the qualified immunity claim. The Court believes it possible to decide this motion for summary judgment under existing law and need ·not rely entirely on a holding that qualified immunity cannot be based on the bfoq affirmative defense.

**4. Defendant has not Established the Facts Necessary to Support a bfoq Defense or Qualified Good Faith Immunity**

The first element of the bfoq defense requires the defendant to establish that the job qualification or function justifying the discrimination is reasonably necessary to the essence of the defendant's particular business. Here, the relevant job qualification is the ability to perform random and routine body searches of female inmates. Thus, we ask, are random and routine body searches of female inmates reasonably necessary to the essence of the particular business of operating a women's prison. We assume without deciding that it is reasonably necessary.[1]

---

**1.** We assume without deciding for two reasons. First it appears more likely than not that such searches are reasonably necessary. It cannot be gainsaid that it goes to the essence of a correctional facility to keep order, discipline and prevent illegal activity. The smuggling of illegal

The second element of the bfoq defense requires the defendant to establish that gender is a legitimate proxy for the qualification or function. In this situation, gender is a legitimate proxy if there is a substantial basis for believing that all or nearly all employees of the affected gender lack the qualification or ability to perform that function.

Mr. Angelone claims that it is illegal for male C/Os to conduct routine or random body searches of female prisoners. If this is true, then there is a legal prohibition against male C/Os performing the function which, for purposes of this motion, we assume to be reasonably necessary to the essence of the business of running prisons. It follows *a fortiori* that the second element is satisfied, if in fact there is a legal prohibition as claimed.

This is precisely where Mr. Angelone's claim founders.

### i. No *per se* rule

First, Mr. Angelone argues that *Jordan v. Gardner* created a *per se* rule making it illegal for male correctional officers to conduct routine or random body searches of female prisoners. If that were so, such a rule would be binding upon Mr. Angelone, for the *Jordan* decision comes from an *en banc* assembly of the Ninth Circuit Court of Appeals, the highest court for this district and circuit to have addressed the issue. *Jordan v. Gardner*, 986 F.2d 1521 (9th Cir.1993) (*en banc*).

However, as discussed in a prior order (Doc. # 21) at pp. 6–8, *Jordan v. Gardner*, does not create any such *per se* rule. *See id.* The *Jordan* Court specifically limited its holding to the facts and the prison before it. *Id.* at 1531 (affirming district court's holding that "specifically noted that its decision 'does

not extend to cross gender searches ... at female institutions other than [WCCW].'") (quoting district court findings and conclusions at p. 13, ¶ 33). The *Jordan* Court concluded "that the injunction [as granted by the district court] was appropriately tailored to prohibit the identified constitutional violation." *Id.*

For these reasons there is no *per se* rule upon which Mr. Angelone may rely which would permit him to take the challenged actions. There is no *per se* rule providing a substantial basis for believing that male C/Os lack the legal ability to perform random or routine body searches of female inmates.

### ii. No reliance on legal advice

Mr. Angelone claims that he received direction from the Nevada Attorney General's office advising him that *Jordan v. Gardner* did create a *per se* rule. The exhibits offered support this statement. *See* Exhibit A, attached to motion (Doc. # 12) in which the Attorney General's office states "the Ninth Circuit has now held prison officials *may not* conduct routine or random clothed body searches of female inmates which include touching of and around breast areas and genital areas by male correctional officers." The Attorney General's office further states "[e]ssentially, nonemergency, suspicionless clothed body searches of female inmates by male correctional officers is forbidden." *Id.*[2]

Government officials are charged with knowledge of the relevant legal rules and court interpretations of those rules. *Federal Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 477 (9th Cir.1991) citing *Lum v. Jensen*, 876 F.2d 1385, 1387 (9th Cir.1989) *cert. denied*, 493 U.S. 1057, 110 S.Ct. 867, 107 L.Ed.2d 951 (1990); *Tribble v. Gardner*, 860

---

drugs, weapons and other contraband is inimicable to the purpose of a correctional facility. Random and routine body searches are most likely necessary to prevent or at least diminish the extent of such illegal activity.

Second, the Court feels it unnecessary to decide this factual issue as defendant has failed to provide any evidence relating to other necessary elements of the bfoq claim and, by extension, has failed to provide any evidence relating to elements of the qualified immunity claim.

2. We do not mean in any way to disparage the Nevada Attorney General's office. It may be that this is the "essential" result. However, if that is so, it depends on an assumed state of facts; i.e. that the factual conditions present in the *Jordan* case are generally true for all female facilities. This may be a reasonable assumption. This may in fact be true. It may be reasonable to treat the *Jordan* decision as stating a *per se* rule. However, whether this is reasonable or not is a question of fact which must be supported by evidence.

F.2d 321, 324 (9th Cir.1988) *cert. denied,* 490 U.S. 1075, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989).

■ Although harsh, the result is that a government official, wrongly advised by legal counsel regarding the court's holding in a recent case is still charged with knowledge of the true holding. This means that Mr. Angelone is not entitled to rely on the incorrect statement of the Nevada Attorney General's office in establishing his affirmative defenses of bfoq and qualified immunity. This Court will not rely on Mr. Angelone's subjective understanding of those cases but instead must impute to Mr. Angelone a correct understanding of the law.

Mr. Angelone may not rely on the Nevada Attorney General's opinion—that *Jordan* stated a *per se* rule—as a substantial basis for believing that male C/Os may not legally perform random or routine body searches of female prisoners.

### iii. There is no evidence indicating that the facts of this case require application of *Jordan*

■ As the Court indicated in its prior order, Mr. Angelone might have been entitled to summary judgment on the basis of a bfoq defense if he had provided evidence indicating that the facts underlying the *Jordan* decision also existed in the correctional institutions involved in this case: Silver Springs Conservation Camp (SSCC) and Nevada Women's Correctional Center (NWCC).

The basis for the Ninth Circuit's decision in *Jordan,* were the factual findings of the district court. The district court found a large percentage of the female prisoners would suffer psychological pain or harm upon being physically searched by men. This pain was in some cases extreme and often greater than *de minimis.* The district court found a "high probability of great harm, including severe psychological injury and emotional pain and suffering, to some inmates from these searches, even if properly conducted." *Jordan* 986 F.2d at 1525 quoting the district court's Findings & Conclusions at ¶ 8. On the basis of this finding the Court of Appeals found that the legal standard for infliction of

pain under the Eighth Amendment was satisfied.

The Court of Appeals also found that this pain was "unnecessary and wanton" based on further specific findings of fact. *Jordan,* 986 F.2d at 1527, 1530. These factual findings included a determination that cross-gender searches were unnecessary based on the district court's finding that the particular prison's "security is not dependent upon cross-gender clothed body searches." *Jordan,* 986 F.2d at 1526. In the *Jordan* case, the superintendent of the prison confirmed at trial that "concerns about internal security and the need for random searches ... had been met by the establishment of random and routine searches by female guards." *Id.* at 1527. Furthermore, with respect to the potential clash between prisoners' privacy rights and guards employment rights, the Court of Appeals noted that "[a]t trial, the prison officials' own witnesses testified that not a single bid had been refused, promotion denied, nor guard replaced as a result of the ban on routine cross-gender clothed body searches." *Id.* On the basis of this record, the Court of Appeals affirmed the district court's conclusion that "[t]he proposed random or routine cross-gender clothed body searches constitute the infliction of pain *without penological justification....*" *Id.*

There is some evidence in the record before this Court indicating that, in Mr. Angelone's judgment, random and routine cross-gender body searches are necessary (if male officers are to be employed at these institutions), in the context of the staffing patterns at SSCC and NWCC. We may not freely disregard this judgment if it was a considered decision. *Whitley v. Albers,* 475 U.S. 312, 322, 106 S.Ct. 1078, 1085–86, 89 L.Ed.2d 251 (1986). Although this support Mr. Angelone's position at first blush, on further analysis it is ambivalent.

The evidence cited to this Court by Mr. Angelone indicates that the staff is so small that each staff member must be able to perform random and routine body searches. Staffing is allegedly so minimal that if a male officer were stationed at a particular location, there would be no other officer to perform searches. In other words, the man stationed

to that position must perform the searches or no searches will be performed at all due to staffing constraints. Thus, if female prisoners learned that male officers could not perform random or routine body searches, they would wait until a male officer was stationed at a particular location to attempt to smuggle contraband secure in the knowledge that they were immune from a random or routine search at that location.

This evidence makes it appear that a policy allowing random and routine cross-gender body searches is necessary if male officers are to be allowed to work at SSCC or NWCC. To the extent the evidence establishes that such random and routine searches are necessary, this supports Mr. Angelone's position. However, this rebuts the "wantonness" prong.

The evidence established that the superintendent involved in the *Jordan* case was "deliberately indifferent" to the female prisoners' pain and suffering. *Jordan*, 986 F.2d at 1528–30. This satisfied the "wantonness" prong of the Eighth Amendment analysis. Crucial to the *Jordan* Court's finding of wantonness, was the determination that the superintendent

> considered the harm his policy would cause and instituted the policy nevertheless. He did so because of an exaggerated regard for pragmatic interests of lesser significance and a lack of proper concern for the serious infringement of a counter-vailing constitutional interest.

*Id.* at 1530. This can be summed up as a determination that deliberate indifference exists when an official gives greater weight to insignificant institutional concerns and lesser weight to individual prisoners' constitutional rights.

Mr. Angelone has presented no evidence indicating that if he had not transferred male C/Os out of the female institutions this would have been deliberately indifferent. The clash of prisoner privacy rights and employee equal opportunity rights is potentially much more serious here than in the *Jordan* case. Thus, a decision to allow male C/Os to conduct body searches might not be wanton under these facts.

In summary, the Court of Appeals in *Jordan* held that a particular cross-gender body search policy violated the Eighth Amendment rights of the female prisoners. This holding was based on specific evidence supporting findings that the particular policy caused the inmates "pain," was "unnecessary" and "wanton."

In order for Mr. Angelone to establish a bfoq defense (or a qualified immunity defense derived from a bfoq claim) based on the *Jordan* case or on Eighth Amendment concerns generally, Mr. Angelone must provide evidence establishing each of three elements: pain, lack of necessity and wantonness, or at least that a reasonable officer in his position could have believed these three elements were present.

Mr. Angelone has failed to provide any evidence clearly supporting certain of these elements. For these reasons, the Court must conclude that Mr. Angelone has failed to establish a substantial basis for believing that all male correctional officers at SSCC and NWCC lack the legal ability to perform random or routine body searches of female inmates.[3]

### 5. Conclusion

Mr. Angelone has failed to establish the second element of the bfoq defense. This failure is in the nature of a complete absence of evidence, rather than insufficient evidence to remove any genuine issue regarding this second element. The extent of this failure is such that Mr. Angelone has failed to provide evidence indicating that a reasonable officer in Mr. Angelone's position could believe that this second element was satisfied. Therefore, Mr. Angelone has failed to establish any

---

**3.** The Court has focused on the existence of a legally mandated bfoq created by the *Jordan* case. The Court has done so because this is the only basis upon which defendant claims a bfoq. This should not be taken as an indication that a bfoq will only exist in situations involving Eighth Amendment violations. It may be that a bfoq could be justified on institutional concerns regarding security, the rehabilitative role of correctional centers, and simple decency in order to afford female inmates as much privacy as possible, even if not constitutionally mandated or protected.

entitlement to qualified good faith immunity based on the bfoq defense.

**IT IS, THEREFORE, HEREBY OR-DERED that** defendant, Mr. Ron Angelone's motion for summary judgment (Doc. # 25) is *DENIED.*