*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0418p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROSLYN EVERSON; RANDY FOX; STENNIS GEORGE;
BRENDA L. SEBASTIAN, and a class of all persons
similarly situated,

*Plaintiffs-Appellees,*

*v.*

MICHIGAN DEPARTMENT OF CORRECTIONS; BILL
MARTIN, individually and in his official capacity as
Director of the Michigan Department of Corrections,
*Defendants-Appellants (02-2033),*

LINDA NUNN; TRACY NEAL,
*Intervening Defendants-Appellants
(02-2028/2084).*

Nos. 02-2028/2033/2084

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-73133—Avern Cohn, District Judge.

Argued: February 4, 2004

Decided and Filed: December 3, 2004

Before: NORRIS, GILMAN, and ROGERS, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Deborah A. LaBelle, LAW OFFICES OF DEBORAH LaBELLE, Ann Arbor, Michigan, Mark W. Matus, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellants. John R. Runyan, SACHS WALDMAN, Detroit, Michigan, for Appellees. **ON BRIEF:** Deborah A. LaBelle, LAW OFFICES OF DEBORAH LaBELLE, Ann Arbor, Michigan, Mark W. Matus, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan, for Appellants. John R. Runyan, Eileen Nowikowski, Marshall J. Widick, SACHS WALDMAN, Detroit, Michigan, for Appellees.

ROGERS, J., delivered the opinion of the court, in which NORRIS, J., joined. GILMAN, J. (pp. 20-21), delivered a separate dissenting opinion.

1

---

## OPINION

---

ROGERS, Circuit Judge.  Following separate lawsuits by female prisoners in Michigan and by the Civil Rights Division of the United States Department of Justice, both of which alleged rampant sexual abuse of female prisoners in Michigan, the Michigan Department of Corrections (the "MDOC") barred males from working in certain positions at its female prisons.  Specifically, the MDOC designated approximately 250 Correctional Officer ("CO") and Residential Unit Officer ("RUO") positions in housing units at female prisons as "female only."  A group of MDOC employees, both males and females, sued the MDOC, alleging that the MDOC's plan violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2202.  Following a bench trial, the district court ruled in the plaintiffs' favor, concluding, among other things, that gender was not a bona fide occupational qualification (a "BFOQ") for the positions in question.  The district court entered a permanent injunction enjoining the MDOC from making gender-specific assignments at female prisons.  Because gender is a BFOQ for the positions in question, we reverse the judgment of the district court.

## BACKGROUND

At the time of trial, the MDOC managed a population of approximately 2000 female prisoners.[1] Currently, the MDOC houses most of its female prisoners at three facilities.  The Robert Scott Correctional Facility (the "Scott Facility"), located in Plymouth, Michigan, is a multilevel prison with an operating capacity of 860 prisoners, and it serves as the reception center for all incoming female prisoners.  The Western Wayne Correctional Facility (the "Wayne Facility"), also located in Plymouth, Michigan, is a secure Level I facility with an operating capacity of 775.  Camp Brighton, located near Pinckney, Michigan, is a Level I facility with barracks-style housing, and it has an operating capacity of 358.

At the time of trial, the MDOC employed approximately 19,000 persons, about 9400 of whom served as COs and RUOs.  The duties of COs and RUOs in the housing units include patrolling the sleeping, shower, and bathroom areas, attending to the basic needs of women prisoners (including the provision of sanitary supplies), monitoring activity in the living quarters, enforcing housing rules and procedures, and assuring that proper standards of care and hygiene are maintained.  RUOs staff the housing units on the first and second shifts, while COs staff the housing units on the third shift.  CO positions outside the housing units include intake officer and transportation officer.  Intake officers shepherd prisoners through the intake process, during which new prisoners are strip searched, fingerprinted, and showered, and during which paperwork is completed on the prisoners.  Intake officers examine prisoners while they are naked.  Among other things, transportation officers drive inmates to prisons to which they have been transferred and to medical appointments.  Sometimes during transportation, female prisoners, who are placed in restraints, require the assistance of a transportation officer to use the bathroom.

The parties have provided only a partial picture of the staffing at Michigan's female prisons. According to the testimony of Lori Sahl, a corrections officer employed at the Wayne Facility, there are three officers per shift assigned to each housing unit at the Wayne Facility.  Each unit comprises a pair of wings which house between 80 and 90 inmates each.  One officer works the "A" wing, one officer works the "B" wing, and one officer works at a desk, where he or she watches the other two officers as they make their rounds.  R. 113, Tr. at 91.  According to the testimony of Joan Yukins, the warden of the Scott Facility, the housing units at the Scott Facility are shaped like a bow tie with an "A" side, a "B" side, and a "center"

---

[1]At the time of trial, female prisoners represented 4.3% of the MDOC's total population of approximately 46,000 prisoners. According to the MDOC, since trial, the total population has increased to 50,600 prisoners, and the female population has increased to 2,100 prisoners, 4.2% of the total population.

containing offices and laundry rooms. In most of the units, each side holds 96 inmates, though the capacity is lower in the high-security and psychiatric units. For the most part, the units are staffed with either two officers per side or one officer per side plus a "rover." R. 119, Tr. at 15-18, 21.

The problem of sexual abuse[2] and other mistreatment of female inmates has long plagued the MDOC. In 1993, following interviews of a number of inmates, the Michigan Women's Commission[3] advised the MDOC that it believed that "sexual assault and harassment are not isolated incidents and that fear of reporting such incidents is a significant problem." In 1996, after an independent investigation, Human Rights Watch issued a report concluding that "rape, sexual assault or abuse, criminal sexual contact, and other misconduct by corrections staff are continuing and serious problems within the women's prisons in Michigan [and] have been tolerated over the years at both the institutional and departmental levels."[4] Human Rights Watch also charged that the male corrections staff routinely violated the privacy rights of inmates by, for example, abusing their power to conduct "pat-down" searches and improperly viewing inmates as they used the shower or toilet. Later, in 1998, Human Rights Watch issued a second report describing a campaign of retaliation by corrections staff against several women who had made public accusations of sexual abuse. In 1999, following its own investigation, the United Nations Commission on Human Rights seconded Human Rights Watch's charge that corrections officers systematically retaliated against women who reported sexual abuse.

Statistics compiled by the parties add some content to the charge of rampant sexual abuse of female inmates in Michigan's prisons. According to the MDOC, between 1994 and January 31, 2001, it investigated 217 allegations of sexual misconduct[5] against female inmates, of which 43 were sustained and of which only 47 were deemed unfounded. According to the plaintiffs' calculations, between 1994 and 2000, female inmates made 208 allegations of sexual misconduct, of which 58 were sustained or resulted in the resignation, leave, or discharge of the accused. In 1997 and 1998, Michigan cases constituted 10 out of a total of 20 convictions of male staff nationwide for criminal sexual conduct against women prisoners.

---

[2]The MDOC recognizes three categories of what we collectively term "sexual abuse." "Sexual misconduct" means engaging in, or attempting to engage in, any of the following:

1.  A sexual act with any prisoner.

2   The intentional touching, either directly or through clothing, of a prisoner's genitals, anus, groin, breast, inner thigh or buttocks with the intent to abuse, humiliate, harass, degrade, arouse, or gratify the sexual desire of any person.

3.  Prohibited physical contact, including fondling or kissing.

4.  Indecent exposure or other indecent sexual behavior by staff in the presence of a prisoner.

"Sexual Harassment" means "sexual advances, requests for sexual favors, and other offensive verbal or physical conduct, including communications, of a sexual nature with a prisoner. This includes verbal conduct of a gender-related nature intended to humiliate, harass, degrade or arouse." "Overfamiliarity" means "[c]onduct between staff and a prisoner which has or is likely to result in intimacy or a close personal association, or conduct that is contrary to the good order of the facility."

[3]The Michigan Women's Commission is an independent unit in the executive office of the governor. Mich. Comp. Laws Ann. § 10.71 (West 2001).

[4]Human Rights Watch found that the current allegations of sexual abuse were "consistent with a pattern and practice of conduct in women's prisons since, at least, the mid-1980s."

[5]These figures do not include allegations of sexual harassment or overfamiliarity. Additionally, evidence presented at trial indicates that sexual misconduct may be underreported. R. 117, Tr. at 164; J.A. at 3149, 4177.

In addition to public criticism, the MDOC faced a pair of high-profile lawsuits involving the sexual abuse of female inmates in this period. On March 27, 1996, a group of female inmates[6] filed suit in the United States District Court for the Eastern District of Michigan against the MDOC and a number of state officials and corrections officers (the "*Nunn* lawsuit"). The inmates alleged rampant sexual misconduct, sexual harassment, violation of privacy rights, and retaliation by corrections officers, and they asserted violations of the First, Fourth, Eighth, Ninth, and Fourteenth Amendments under 42 U.S.C. § 1983, and of the Violence Against Women Act, 42 U.S.C. § 13981. The inmates' monetary claims were settled for a little less than $4 million, and, on July 31, 2000, the inmates' claim for injunctive relief was resolved by a settlement agreement (the "*Nunn* agreement"). In the *Nunn* agreement, the MDOC pledged, among other things, to restrict pat-down searches of female inmates by male staff, to require male staff to announce their presence upon entering a housing unit area, and to maintain areas where inmates may dress, shower, and use the toilet without being observed by male staff. Additionally, the *Nunn* agreement provided that "[c]onsistent with the MDOC's announced intention to limit the assignment of staff in facility housing units to female officers, the MDOC will make a good faith effort to accomplish this objective."[7]

In June of 1994, the Civil Rights Division of the United States Department of Justice (the "DOJ") initiated an investigation of allegations of sexual abuse and other violations of the constitutional rights of inmates at a pair of Michigan women's prisons pursuant to the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.* The State refused to grant the DOJ access to the facilities, but the DOJ managed to interview over 100 inmates in the course of its investigation. By a letter dated March 27, 1995, the DOJ advised the Governor of Michigan that it had concluded that "various acts, practices, and other conditions at both facilities deny inmates confined there of their constitutional rights." The DOJ found that "sexual abuse of women inmates by guards, including rapes, the lack of adequate medical care, including mental health services, grossly deficient sanitation, crowding, and other threats to the physical safety and well-being of inmates violates their constitutional rights." The DOJ letter reported a pattern of sexual abuse, including sexual assaults by guards, "frequent" sexual activity between guards and inmates, sexually aggressive acts by guards (such as pressing their bodies against inmates, exposing their genitals to inmates, and fondling inmates during "pat-down" searches), and ubiquitous sexually suggestive comments by guards. The DOJ letter also detailed improper visual surveillance of inmates, including the "routine" practices of watching inmates undress, use the shower, and use the toilet.

Two years later, on March 10, 1997, the DOJ filed suit against the State of Michigan in the United States District Court for the Eastern District of Michigan (the "*USA* lawsuit") pursuant to the Civil Rights of Institutionalized Persons Act. The United States alleged that Michigan was violating the constitutional rights of female inmates by failing to protect them from sexual misconduct, by failing to prevent unlawful invasions of their privacy, and by failing to provide adequate medical and mental health care. After conducting extensive discovery, the United States dismissed its claims related to the provision of medical and mental health care. On May 25, 1999, the parties entered into a settlement agreement resolving the remaining claims (the "*USA* agreement"). In the *USA* agreement, Michigan pledged, among other things, to minimize access to secluded areas and one-on-one contact between male staff and female inmates, to implement a "knock and announce" policy whereby male officers must announce their presence prior to

---

[6]The plaintiffs' Second Amended Complaint named 32 female inmates as plaintiffs.

[7]More completely, the MDOC agreed in the *Nunn* agreement to (1) screen applicants for positions involving contact with female inmates for drug abuse and criminal histories, (2) train staff and internal investigators on issues relating to the supervision of prisoners, (3) review training materials on sexual misconduct for prisoners, (4) minimize access to secluded areas and one-on-one contact between male staff and inmates, (5) ban pat-down searches of inmates by male staff absent emergency circumstances during a twelve-month evaluation period, (6) require male staff to announce their presence upon entering a housing unit area, (7) maintain areas where inmates may dress, shower, and use the toilet without being observed by male staff, (8) assign at least one female to transport an inmate, (9) facilitate prisoner and staff reporting of allegations of sexual misconduct, sexual harassment, and retaliation, (10) investigate allegations of sexual misconduct, sexual harassment, and retaliation timely and completely, and (11) make a good faith effort to limit the assignment of staff in housing units to female officers.

entering areas where inmates normally could be in a state of undress, and to restrict pat-down searches of female inmates by male staff.[8]  The MDOC also agreed to conduct a study exploring the feasibility of "redeploying officers to increase the presence of female officers in the housing units" and "rotating staff assignments to housing units," and, if feasible, to implement a plan consistent with this study.

On June 25, 1999, and on October 25, 1999, the MDOC's Director issued Director's Office Memoranda to implement the *USA* agreement. On December 6, 2000, the Director signed a Policy Directive that superseded the Director's Office Memoranda and formalized the changes mandated by the *USA* and *Nunn* agreements.  Major changes in policy instituted by the MDOC included a moratorium on pat-down searches of female inmates by male officers absent exigent circumstances; a "knock and announce" policy requiring male staff to announce their presence before entering places where female prisoners are likely to be in a state of undress; a uniform dress code for prisoners; the minimization of one-on-one contact between male staff and female inmates and of access to secluded areas; the maintenance of one or more locations where inmates may dress, shower, and use the toilet out of sight of male staff; random interviews of female inmates; specialized training for inmates and staff at female prisons; improved procedures for investigating allegations of sexual misconduct and retaliation; and drug testing of and criminal history checks on applicants for employment.

Sometime in 1998, prior to the *USA* and *Nunn* agreements, the MDOC's Director[9] appointed a Gender Specific Assignment Committee (the "GSAC"), consisting of a number of high-level MDOC officials, which was instructed to review officer assignments within Michigan's correctional facilities—both male and female—for the feasibility of making them gender-specific.  In its final report, which was issued on December 11, 1998, the GSAC recommended gender-specific assignments to certain tasks, such as strip searches, pat-down searches, and urine collection.  However, the GSAC unanimously endorsed gender neutrality in assignments to first- and second-shift positions in housing units, and a majority of the committee advised against gender-specific assignments to third-shift positions in housing units. Four of six members recommended that the MDOC move toward "gender balance"—meaning that, "where more than one officer is assigned, the second officer may be gender specific"—through attrition, stating that they did not "believe gender specific assignments are a viable option due to the labor pool and union contracts," but observing that "some states have voluntarily implemented gender specific assignments on specific shifts through letters of agreement with the corrections officers' union or have responded to various threats/instances of court intervention."  One of the dissenters advised that only females should be assigned to third-shift housing unit positions in female facilities, while the other advocated gender-specific assignments to third-shift housing unit positions in both male and female facilities.

Pursuant to the *USA* agreement, the MDOC commissioned Securicor New Century, LLC ("Securicor"), a consulting firm, to study ways to increase the presence of female officers in the housing units at Michigan's women's prisons. In particular, Securicor was instructed to explore the feasibility of redeploying female officers to positions in the housing units and of rotating staff assignments.  Securicor's

---

[8]More completely, Michigan agreed to (1) conduct pre-employment screening, including drug testing and criminal background checks, to determine the fitness of applicants for work at female prisons, (2) provide specialized training for employees at female prisons, (3) educate inmates on the MDOC's prohibitions against sexual misconduct, sexual harassment, and overfamiliarity, (4) facilitate inmate and staff reporting of allegations of sexual misconduct, sexual harassment, and overfamiliarity, (5) investigate allegations of sexual misconduct, sexual harassment, and overfamiliarity in a timely and complete fashion, (6) minimize access to secluded areas and one-on-one contact between male staff and female inmates, (7) conduct random interviews of inmates concerning sexual misconduct, sexual harassment, and overfamiliarity, (8) implement a "knock and announce" policy whereby male officers must announce their presence prior to entering areas where inmates normally could be in a state of undress, (9) ban "pat-down" searches of female inmates by male staff absent exigent circumstances during an evaluation period of at least six months, (10) screen inmates for past histories of physical or sexual abuse, and (11) conduct a study to explore the feasibility of redeploying officers to increase the presence of female officers in the housing units and of rotating staff assignments to the housing units.

[9]The defendant, Bill Martin, was appointed as Director of the MDOC in 1999.

report, dated August 20, 1999, recommended a number of strategies for increasing the number of female officers in the housing units, including exploring the redeployment of all available female officers to housing units, covering RUO vacancies in the housing units with female COs, redeploying female officers in supervisory positions, exploring the possibility of rotating female officers assigned to housing units to different shifts and locations, creating incentives for female applications, changing the shift times to create overlapping shifts, and revising the criteria for promotion.

On October 13, 1999, during testimony before the House Appropriations Subcommittee on Corrections of the Michigan House of Representatives, Bill Martin, the MDOC's Director, disclosed that the MDOC was exploring the possibility of removing male officers from certain areas in female facilities, as well as female officers from certain areas in male facilities, in order to minimize incidents of sexual misconduct. On December 9, 1999, Martin formally announced his intention to remove male officers from female prisons, stating, "I am convinced that the single best way to protect [male officers'] personal and professional lives is to remove them from those assignments in which they are most vulnerable" to allegations of sexual abuse. According to the district court, Martin was unaware of the GSAC's analysis when he made this decision, and there was no evidence presented at trial that any internal MDOC memoranda recommended such a step or that Martin had consulted the Michigan Department of Civil Rights or the Attorney General of Michigan regarding the change.

In February 2000, the MDOC hired Michael Mahoney[10] to study "whether certain custody positions at MDOC women's facilities should be filled only by female custody staff or if there is a less intrusive means to ensure the safety and reasonable privacy needs of female inmates." In June 2000, Mahoney issued a report concluding that only female officers should fill the CO and RUO positions in housing units, segregation units, and intake units at Michigan's women's facilities. He opined that this reform would reduce the likelihood of sexual misconduct, improve the security in the housing units by removing "gun-shy" male officers and by permitting increased surveillance of inmates, and reduce false allegations of sexual misconduct. Mahoney advised that reforms undertaken pursuant to the *Nunn* and *USA* settlements could not alone address the problems of sexual abuse and inmate privacy.

On August 2, 2000, the MDOC filed applications with the Michigan Department of Civil Service (the "MDCS") for "selective certification" of CO and RUO positions in the housing units, segregation units, and intake units at its women's facilities as "female only." In the applications, the MDOC reported that it had faced lawsuits alleging sexual misconduct and violation of privacy rights of female inmates, and had made a number of changes in response to these charges. However, it stated that "it is felt that these changes will not eliminate inappropriate behavior or sexual misconduct," and it claimed that selective certification would

> enhance the privacy of female prisoners, reduce the likelihood of sexual misconduct, the reduction [sic] of fear of sexual misconduct will enhance the ability of the [MDOC] to achieve its mission, security capabilities would be improved due to much less reluctance by female staff to perform observation duties, and female staff only in housing units would reduce the likelihood of instances where individual male staff and individual female prisoners would be involved in long isolated contacts.

On August 14, 2000, the MDCS approved the MDOC's applications without a hearing. As of the summer of 2001, the certification affected 267 positions—257 CO and RUO positions in housing units, 8 transportation officers, and 2 intake officers. The MDOC contends that, in the interim, the total number of affected positions has decreased to 247.

---

[10]Mahoney was the president and executive director of the John Howard Association, a private, not-for-profit prison reform group, and he served as an expert for the DOJ in the *USA* lawsuit.

On July 12, 2000, the plaintiffs[11] filed suit against the MDOC and Bill Martin, the MDOC's director, in his official capacity and individually, in the United States District Court for the Eastern District of Michigan. The plaintiffs alleged that gender-based assignments at female correctional facilities violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and Michigan's Elliott-Larsen Civil Rights Act (the "Elliot-Larsen Act"), Mich. Comp. Laws Ann. § 37.2202(1)(a) (West 2001). Additionally, the plaintiffs asserted against Martin an Equal Protection Clause claim under 42 U.S.C. § 1983. Plaintiffs sought a declaratory judgment that gender-based assignments at female correctional facilities violated Title VII, the Elliott-Larsen Act, and the Equal Protection Clause, injunctive relief enjoining further discrimination, damages for lost earnings, compensatory damages for emotional distress and damage to their reputations, punitive damages against Martin, and attorney fees pursuant to Title VII and the Elliott-Larsen Act.

On September 28, 2000, the district court entered a temporary restraining order, which enjoined the MDOC and Martin "from implementing the plan to make gender-specific assignments and/or to allow only female staff to hold Corrections Officer and Resident Unit Officer positions in work assignments in housing units, segregation units and/or intake units at the Robert Scott, Western Wayne, and Camp Branch Correctional Facilities." On October 13, 2000, the district court granted a motion for intervention filed by a group of female inmates—specifically, the certified class from the *Nunn* Lawsuit and the certified class in *Neal v. MDOC*, No. 96-6986-CZ (Washtenaw Co. Cir. Ct.), another class action by female inmates against the MDOC alleging sexual abuse, privacy violations, and retaliatory conduct by male staff.

The bench trial began on February 13, 2001, and continued over nine days until March 7, 2001. On July 11, 2002, the district court entered a decision and a declaratory judgment providing that gender-based assignments to the CO and RUO positions at the Scott Facility, the Wayne Facility, and Camp Brighton violate Title VII and the Elliot-Larsen Act. The court concluded that the implementation of the policy would have an adverse employment effect on the plaintiffs and that gender was not a bona fide occupational qualification. On August 8, 2002, the district court entered a final judgment, which permanently enjoined the defendants from implementing the plan to make gender-specific assignments to CO and RUO positions at the Scott Facility, the Wayne Facility, and Camp Brighton, and which dismissed the plaintiffs' § 1983 claim against Martin with prejudice.[12]

The district court concluded that gender is not a BFOQ for housing unit officers. The court explained that "[t]here has simply been no showing that there is reasonable cause to find that all, or substantially all, males are not able to perform safely and efficiently the duties of a CO and RUO in the housing units in the female prisons." *Everson v. Mich. Dep't of Corr.*, 222 F. Supp. 2d 864, 895 (E.D. Mich. 2002). In reaching this conclusion, the court made the following findings of fact: (1) standard practices nationwide provide for the employment of male corrections officers in female prisons and "there is nothing unique about the operation of the female prisons in Michigan"; (2) the GSAC and Securicor studies did not recommend this strategy, and "there is no evidence that any MDOC official supported it at the time the request was made to [the MDCS] for selective certification"; (3) the concern over cross-gender supervision of prisoners originated with Martin; (4) the opinions of the plaintiffs' experts were "considerably more credible" than those of the defendants' experts; (5) the changes required by the *USA* and *Nunn* agreements

---

[11]The original plaintiffs are (1) Roslyn Everson, a CO at the Scott Facility, (2) Randy Fox, an RUO at the Camp Branch Correctional Facility in Coldwater, Michigan, which, at the time the suit was filed, housed female inmates, (3) Stennis George, an RUO at the Scott Facility, and (4) Brenda L. Sebastin, a CO at the Camp Cassidy Lake Correctional Facility in Chelsea, Michigan, which, at the time the suit was filed, housed female inmates. Later, Richard Idemudia, an RUO at the Western Wayne Facility, was added as a plaintiff. On November 1, 2000, the plaintiffs moved for certification of a class composed of all corrections officers and related classes of employees who have been or will be adversely affected by the gender-based assignments at correctional facilities that house female prisoners. The district court never ruled on the motion, which the defendants opposed.

[12]On December 7, 2000, the district court bifurcated the issue of damages and stayed discovery pending the resolution of the issue of liability.

have only recently been implemented; (6) statistical evidence showed a "substantial decrease" in improper conduct since the implementation of the changes called for in the *USA* and *Nunn* agreements; and (7) "the published literature on the presence of male correctional officers in female prisons does not support a female BFOQ for corrections officer in the housing units in a female prison." *Id.* at 893-95.

Additionally, the district court determined that reasonable alternatives to the MDOC's plan exist. Specifically, it stated that the Securicor study identified a number of reasonable alternatives—in particular, covering vacancies with females, increasing female coverage where necessary with overtime, and redeploying female officers in supervisory positions—which the MDOC had not explored. *Id.* at 895. Additionally, it noted that the MDOC had not made efforts to enhance pre-employment screening to lessen the likelihood of employing high-risk male COs and RUOs in female prisons. *Id.* The court stressed, however, that nothing in its decision "should be read to prohibit the MDOC officials from making gender specific task assignments." *Id.* at 899. The MDOC and Martin, as well as the intervening defendants, timely appealed.

## ANALYSIS

The district court erred in finding that the female gender is not a BFOQ for the positions of CO and RUO in the housing units at MDOC's female facilities.[13] Title VII of the Civil Rights Act of 1964 broadly proscribes gender-based discrimination in the workplace. *See Grant v. Gen'l Motors Corp.*, 908 F.2d 1303, 1306 (6th Cir. 1990). The MDOC concedes that it has adopted a facially discriminatory plan, and this case therefore "turn[s] on whether such overt disparate treatment is for some reason justified under Title VII." *Reed v. County of Casey*, 184 F.3d 597, 599 (6th Cir. 1999) (internal quotation omitted). Title VII permits overt discrimination if the disparate treatment is based on a bona fide occupation qualification, or BFOQ. *Id.*

The BFOQ defense countenances gender-based discrimination "in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise."[14] 42 U.S.C. § 2000e-2(e) (2001). It is true that the BFOQ defense is written narrowly, and is to be read narrowly. *Int'l Union, United Auto., Aerospace & Agric. Implement*

---

[13] Because we find that gender is a BFOQ, we need not address the defendants' alternative argument that the plaintiff's Title VII claim fails for lack of an adverse employment action by the MDOC.

[14] The Elliot-Larsen Act parallels Title VII. Section 202(1)(a) of the Elliott-Larsen Act provides

An employer shall not do any of the following: . . . Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . sex . . . .

Mich. Comp. Laws Ann. § 37.2202(1)(a) (West 2001). The Elliott-Larsen Act also includes a "BFOQ" defense, which reads

A person subject to this article may apply to the commission for an exemption on the basis that . . . sex is a bona fide occupational qualification reasonably necessary to the normal operation of the business or enterprise. . . . An employer may have a bona fide occupational qualification on the basis of . . . sex . . . without obtaining prior exemption from the commission, provided that an employer who does not obtain an exemption shall have the burden of establishing that the qualification is reasonably necessary to the normal operation of the business.

*Id.* § 37.2208.

Federal civil rights cases are persuasive rather than controlling authority in determining the proper interpretation of the Elliott-Larsen Act. *Bryant v. Automatic Data Processing, Inc.*, 390 N.W.2d 732, 734 (Mich. Ct. App. 1986). However, the parties have not identified any relevant substantive differences between Title VII and the Elliott-Larsen Act, and the parties and the district court have relied almost entirely on federal precedent. Accordingly, we decide the plaintiffs' claim under the Elliot-Larsen Act on the same basis that we decide the plaintiffs' Title VII claim.

*Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 201 (1991).  Moreover, the burden is on an employer to establish a BFOQ defense.  *Grant*, 908 F.2d at 1306.

Courts have offered various formulations of the BFOQ defense, *Dothard v. Rawlinson*, 433 U.S. 321, 333 (1977), and from these decisions we distill the principles that lead us to the conclusion that the defense has been established in this case.  First, "it is impermissible under Title VII to refuse to hire an individual woman or man on the basis of stereotyped characterizations of the sexes," *id.*, and an employer must have a "basis in fact," *id.* at 335, for its belief that gender discrimination is "reasonably necessary"—not merely reasonable or convenient—to the normal operation of its business.  *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir. 1971); *see also Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 414 (1985) (interpreting the BFOQ defense in the Age Discrimination in Employment Act ("ADEA")).  Courts have variously stated that an employer can meet this requirement by showing that "all or substantially all [members of one gender] would be unable to perform safely and efficiently the duties of the job involved," *Johnson Controls*, 499 U.S. at 207 (quoting *Weeks v. S. Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 (5th Cir. 1969)); that "it is impossible or highly impractical" to determine on an individualized basis the fitness for employment of members of one gender,[15] *Harriss v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 676 (9th Cir. 1980) (quoting *Weeks*, 408 F.2d at 235 n.5); or that "the very womanhood or very manhood of the employee undermines his capacity to perform a job satisfactorily," *Torres v. Wisc. Dep't of Health & Soc.*

---

[15]The plaintiffs maintain that the "impossible or highly impractical" standard applies only to the BFOQ defense set forth in the ADEA.  They argue that the court should not import this "lower" standard into Title VII jurisprudence because (1) Title VII's BFOQ "provides only the narrowest of exceptions to the general rule requiring equality of employment opportunities," *Dothard v. Rawlinson*, 433 U.S. 321, 333 (1977), (2) the Supreme Court declined to adopt the standard for Title VII cases in *International Union, United Automobile, Aerospace and Agriculture Implement Workers of America v. Johnson Controls, Inc.*, 499 U.S. 187 (1991), and (3) the standard is premised on considerations unique to the aging process.

The plaintiffs' argument fails for a number of reasons.  Most fundamentally, the "impossible or highly impractical" standard is not solely an ADEA standard.  This language appears to have originated in a Title VII case, *Weeks v. So. Bell Tel. & Tel. Co.*, 408 F.2d 228, 235 n.5 (5th Cir. 1969), and subsequently to have been applied in ADEA cases.  *Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 414 n.19 (1985).  At least two circuits have utilized this language in Title VII cases.  *Harriss v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 676 (9th Cir. 1981); *Weeks*, 408 F.2d at 235 n.5.

Moreover, even if the standard had not yet been applied in Title VII cases, precedent suggests that it should be.  "The provisions of the ADEA generally receive an identical interpretation to corresponding provisions of Title VII," *Lilley v. BTM Corp.*, 958 F.2d 746, 750 n.2 (6th Cir. 1992),  and Title VII and the ADEA define the BFOQ defense in materially indistinguishable terms.  *Compare* 29 U.S.C. § 623(f)(1) (2001) ("It shall not be unlawful for an employer . . . to take any action otherwise prohibited . . . where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business . . . ."), *with* 42 U.S.C. § 2000e-2(e) ("[I]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of . . . sex . . . in those certain instances where . . . sex . . is a bona fide occupational reasonably necessary to the normal operation of that particular business or enterprise. . . .").  In fact, the Supreme Court has observed that Congress borrowed the concept and statutory language from Title VII's BFOQ defense in composing the ADEA's BFOQ defense, and the Court has used Title VII and ADEA case law interchangeably.  *Johnson Controls*, 499 U.S. at 201; *Criswell*, 472 U.S. at 412, 416.

The plaintiffs' arguments against applying the "ADEA" standard in Title VII cases—the plaintiffs do not acknowledge the lineage of the "impossible or highly impractical" standard—are not persuasive.  The Court has read the ADEA's BFOQ defense, "which tracks the BFOQ provision in Title VII, just as narrowly." *Johnson Controls*, 499 U.S. at 201.  The *Johnson Controls* decision concerned whether the employer's asserted BFOQ related to the "essence" of the employer's business, and did not purport to hold that an employer can establish "reasonable necessity" only by showing that "all or substantially all woman would be unable to perform safely and efficiently the duties of job involved." *Johnson Controls*, 499 U.S. at 206-07 (internal quotations omitted).  The plaintiffs fail to identify the "considerations unique to the aging process" that require a departure from the usual practice of interpreting Title VII and the ADEA in identical fashion.

In short, the BFOQ defense has not been reduced to a single, universally-applicable test.  The "all or substantially all" and "impossible or highly impractical" standards are, to use the language of *Dothard,* 433 U.S. at 333, "formulations" of the "reasonable necessity" requirement, not hard-and-fast rules of law.  These tools may or may not assist a court in evaluating the facts of the particular case before it.  In the instant case, both standards have helped guide our analysis, but our decision does not turn on the use of either standard.

*Servs.*, 859 F.2d 1523, 1528 (7th Cir. 1988) (en banc).  Second, the Supreme Court has stressed that "in order to qualify as a BFOQ, a job qualification must relate to the essence, or to the central mission of the employer's business." *Johnson Controls*, 499 U.S. at 203 (internal citations and punctuation omitted). Third, this court imposes on employers asserting a BFOQ defense the burden of establishing that no reasonable alternatives exist to discrimination on the basis of sex.  *Reed*, 184 F.3d at 600.

In reaching the conclusion that the female gender is a BFOQ for the CO and RUO positions in this case, we are aided by a series of cases that directly address the issue of gender as a BFOQ for corrections officers in female correctional facilities.  *Reed*, 184 F.3d at 600; *Robino v. Iranon*, 145 F.3d 1109, 1110-11 (9th Cir. 1998); *Tharp v. Iowa Dep't of Corr.*, 68 F.3d 223, 226 (8th Cir. 1995); *Torres*, 859 F.2d at 1532. These decisions teach that the reasoned decisions of prison officials are entitled to deference and that the goals of security, safety, privacy, and rehabilitation can justify gender-based assignments in female correctional facilities.

Because of the unusual responsibilities entrusted to them, the redoubtable challenges they face, and the unique resources they possess, the decisions of prison administrators are entitled to a degree of deference, even in the Title VII context.  As the Seventh Circuit, sitting en banc, observed, prison officials

> must grapple with the "perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system:  to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens."

*Torres*, 859 F.2d at 1529 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981)).  To meet this daunting task, the court continued, "prison administrators always have been expected to innovate and experiment. Unless prison administrators try new approaches, the 'intractable problems' will remain and the lot of the incarcerated individual will not improve.  Indeed, it probably will deteriorate."  *Id.* (internal citation omitted).  Thus, the court concluded that, although the decisions of prison officials are not accorded as much deference in Title VII cases as they are in constitutional cases,[16] "their judgments still are entitled to substantial weight when they are the product of a reasoned decision-making process, based on available information and experience."  *Id.* at 1532; *see also Robino*, 145 F.3d at 1110 (holding that the professional judgments of prison administrators are entitled to deference); *cf. Tharp*, 68 F.3d at 226 (applying a "deferential balancing test" to constitutional component of plaintiffs' challenge to prison administrator's gender-based staffing assignments).

The district court distinguished *Torres* and its progeny on the ground that the MDOC's decision "reflected neither reasoned decision making nor professional judgment, but rather the consequence of a

---

[16]In cases involving constitutional challenges to the actions of prison administrators, the Supreme Court has stressed repeatedly that the decisions of administrators are entitled to substantial deference.  *See, e.g., Washington v. Harper*, 494 U.S. 210, 223-24 (1990); *Turner v. Safley*, 482 U.S. 78, 84-85, 89 (1987); *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986).  In particular, "the proper standard for determining the validity of a prison regulation claimed to infringe on an inmate's constitutional rights is to ask whether the regulation is reasonably related to legitimate penological interests," even when "the constitutional right claimed to have been infringed is fundamental, and the State under other circumstances would have been required to satisfy a more rigorous standard of review."  *Harper*, 494 U.S. at 223 (internal quotation marks omitted).  Behind this rule is the recognition that

> courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. . . . [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.  Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government.  Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.  Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.

*Turner*, 482 U.S. at 84-85 (internal citations omitted).

belief of one person, not a correctional professional, in a transitory position of authority, that it was best for the female prisons in Michigan." *Everson*, 222 F. Supp. 2d at 898. The court elaborated,

> The reason for this case is that Martin became director and he came to the position with a stereotypical view of the role of sex in employment in male and female prisons: males guard males and females guard females. Without consulting his staff and without a review of internal studies, national policies or the literature Martin, and Martin alone, decided the change was appropriate and the MDOC staff fell in line. Martin had no qualifications from past training[,] employment or experience to make a reasoned judgment on the subject and his leaving corrections as a profession simply confirms this.

*Id.* at 897. In defending the district court's ruling, the plaintiffs point to the district court's findings that Martin did not consult with his staff, that the MDOC did not submit its BFOQ request to the Michigan Department of Civil Rights, and that the GSAC study did not recommend gender-specific assignments.

The district court committed legal error in concluding that the MDOC had forfeited the deference normally afforded prison administrators. Cases may arise in which a prison official has acted so capriciously that his decision does not deserve deference, but the case at bar does not fall in this category. The MDOC was not obligated to follow any particular protocols in order to earn deference, and the district court applied too exacting a standard in dismissing the MDOC's deliberations as inadequate. In effect, the district court circumvented the rule of deference by second-guessing the procedures employed by the MDOC.

Though it did not exhaust its institutional resources, the MDOC made a considered decision that a BFOQ was necessary to address the grave problem of sexual abuse of female inmates. When Martin assumed the position of Director, the MDOC faced a pair of high-profile lawsuits and a chorus of public criticism charging that it had ignored, or covered up, widespread sexual abuse of its female inmates—a situation calling for prompt and decisive action. In the *USA* agreement, the MDOC agreed to study the feasibility of increasing the presence of female officers in the housing units,[17] and, in the *Nunn* agreement, the MDOC agreed to make a good faith effort to limit the assignment of staff in housing units to female officers. J.A. at 1255, 1266. The Securicor study, undertaken pursuant to the *USA* agreement, recommended that the MDOC "explore the re-deployment of all available female corrections officers . . . to housing units." J.A. at 994. Mahoney's report, which Martin commissioned prior to the MDOC's application for selective certification, recommended that only women be assigned to the CO and RUO positions in the housing, segregation, and intake units because, in Mahoney's opinion, only this action could ensure safe and humane conditions of confinement and the professional operation of the MDOC's facilities. J.A. at 1441. Additionally, Martin testified that he consulted with his staff about the plan prior to seeking selective certification and discussed privacy accommodations for female inmates with prison officials from other states. J.A. at 3307-08, 3314. Finally, the MDOC assembled an array of materials in support of its application for selective certification,[18] and the MDCS approved the application.[19] Clearly, the MDOC's

---

[17] Three experts for the DOJ in the *USA* lawsuit recommended that, consistent with Title VII's mandate of equal employment opportunity, the MDOC staff the housing units in its female facilities with female staff only, either permanently or until misconduct was reduced. J.A. at 4009-10, 4014, 4116, 4167.

[18] The materials included a summary of disciplinary action taken against MDOC employees for sexual abuse, data on practices in female prisons in other states, descriptions of the duties of COs and RUOs in the housing units in Michigan's female facilities, applications for a BFOQ for officer positions at a women's prison prepared by Wisconsin corrections officials, expert reports from the *USA* lawsuit, the GSAC study, the Securicor study, the Mahoney report, and the *USA* and *Nunn* agreements. J.A. at 3729-4203.

[19] The district court found that the Department of Civil Service "rubber-stamped" the MDOC's application. *Everson v. Mich. Dep't of Corr.*, 222 F. Supp. 2d 864, 878 (E.D. Mich. 2002). We find this conclusion, which was based solely on the fact that the approval took twelve days, unwarranted.

plan was "the product of a reasoned decision-making process," *Torres*, 859 F.2d at 1532, and not simply the result of Martin's whim.

The procedural shortcomings identified by the district court do not dictate a contrary conclusion.[20] The district court apparently reasoned that, because Martin had a limited background in corrections, because Martin did not consult with the wardens of the female facilities before adopting the plan, because the MDOC did not seek approval from the Michigan Department of Civil Rights, and because the GSAC study did not recommend a BFOQ, the plan did not reflect the institutional expertise of the MDOC and, hence, did not merit deference. However, as discussed above, the evidence shows that Martin drew on some, though not all, of the resources and expertise of the MDOC in the course of settling the *USA* and *Nunn* lawsuits and formulating the plan. Moreover, the district court failed to recognize that courts defer to the judgments of prison administrators not simply because of their expertise. Additional reasons counsel in favor of a policy of judicial restraint: the ability of administrators to plan and muster resources, the primary nature of the executive—as opposed to the judicial—branch of government to run the prisons, and the respect owed to state sovereignty by the federal judiciary. *Cf. Turner v. Safley*, 482 U.S. 78, 85 (1987). These considerations apply whether or not Martin acted unilaterally. Finally, none of the irregularities identified by the district court vitiated the MDOC's decision-making process. A prison official need not run his department as a participatory democracy nor build "unanimity of opinion" to win deference. *Torres*, 859 F.2d at 1532. Neither the district court nor the plaintiffs explain what sort of penological expertise the Michigan Department of Civil Rights would have contributed, and there was no statutory requirement that the MDOC obtain approval from the Department of Civil Rights. Mich. Comp. Laws Ann. § 37.2208 (West 2001). To bind the MDOC to the recommendations of the GSAC, which were made before Martin became Director and before the *USA* and *Nunn* agreements, would, in violation of *Torres* and its progeny, deprive the MDOC of the freedom to evolve and innovate.[21] In short, in closely scrutinizing the decision-making process of the MDOC, the district court effectively rendered the rule of deference a nullity.

Application of the correct legal standard, which mandates that we give due regard to the professional judgment of the MDOC, makes it clear that the female gender is a BFOQ for the CO and RUO positions in the housing units at female prisons in Michigan. Viewed in proper perspective, the exclusion of males from these positions is "reasonably necessary" to "the normal operation" of the MDOC's female facilities. The MDOC reasonably concluded that a BFOQ would materially advance a constellation of interests related to the "essence" of the MDOC's business—the security of the prison, the safety of inmates, and the protection of the privacy rights of inmates—and reasonable alternatives to the plan have not been identified.

Unquestionably, the security of the prisons relates to the essence of the MDOC's business, and the MDOC maintains that the presence of male COs and RUOs in female housing units imperils security in a number of ways. First, the presence of males in the housing units necessitates the use of "artificial barriers to security" such as covers for cell windows, doors on the toilet stalls, shower curtains, the moratorium on pat-down searches by male officers, and the "knock and announce" policy.[22] Second, allegations of sexual

---

[20] Prior to his appointment as director of the MDOC, Martin's only experience in corrections was his four years of service on the Corrections Committee of the Michigan House of Representatives while a state legislator.

[21] Additionally, the GSAC's recommendations rested, at least in part, on the conclusion that gender-based assignments were not a viable option "due to the labor pool and union contracts"—a conclusion silent as to the penological soundness of gender-based assignments. J.A. at 3933.

[22] George Camp, a former corrections official and currently a corrections consultant, testified that these artificial barriers to security "give inmates an opportunity to manipulate behind that, to do things that they ought not to be doing, for the staff not to be aware, not to interact with them, and I think that runs counter to being alert, observant, and in the know, and you have to have that." J.A. at 3110. He further testified that "[o]nce you abandon any part of the turf at any time or any place, you have sent a signal that this belongs to the inmates and it cannot, and once you do that, it leads to a creeping and eroding of the legitimate rights, the legitimate obligation of a prison staff to be everywhere, to be informed, to be alert." J.A. at 3111. Similarly, Annabelle

abuse, whether true or not, create a "poisoned atmosphere" that breeds misconduct on the part of inmates and guards.[23]     Third, many male officers, afraid of false accusations of sexual abuse, become "gun-shy" and fail to monitor and discipline inmates in a proactive fashion.[24]

Giving due deference to the judgment of the MDOC, we agree that the MDOC's plan will significantly enhance security at the MDOC's female facilities. Support for the MDOC's position comes from *Dothard v. Rawlinson*, 433 U.S. 321 (1977), in which the Supreme Court held that the male gender was a BFOQ for prison guards in Alabama's maximum-security men's prisons. The environment in Alabama's penitentiaries was, in the words of the Court, "a peculiarly inhospitable one for human beings of whatever sex," characterized by "rampant violence" and a "jungle atmosphere." *Id.* at 334 (internal quotations omitted). Noting that inmates were housed in dormitories rather than cells, that inmates were not segregated according to their offense or level of dangerousness, and that an estimated 20% of inmates were sex offenders, the Court found "a basis in fact for expecting that sex offenders who have criminally assaulted women in the past would be moved to do so again if access to women were established within the prison," and it spotted "a real risk that other inmates, deprived of a normal heterosexual environment, would assault women guards because they were women." *Id.* at 335. The Court concluded,

---

Romero, who worked as a consultant for the DOJ in connection with the *USA* Lawsuit, described the shades for cell windows as "a Band-Aid approach" that prevents officers from "accomplishing 100 percent of their duties" and "creates a security hazard for both the officers and the inmates." J.A. at 3373-74. Likewise, Director Martin testified that "[a]ny time you put barriers in a facility from observation, direct observation, it puts I think inmates and staff at certain risk. For instance, if a window curtain is up on a cell door and an officer, male or female, it doesn't matter, can't see in, there's no way we can intervene in a suicide attempt because we don't know that's going on. We just don't know what's behind it, and it seems contrary then to other recommendation that you put windows in other doors [so] that you can always see in." R. 114, Tr. at 166. Finally, Joan Yukins, the warden of the Scott Facility, criticized "t[ying] the hands of male corrections officers in the housing units" by means of the shades for cell windows and the moratorium on "pat-down" searches. R. 119, Tr. at 33. She stated that she thought "we can function better in those housing units with females in there being able to look over the curtains, go into bathrooms, go into the showers if necessary, pat down the prisoners in the housing units where they live." J.A. at 3620.

[23]Michael J. Mahoney, an expert for the DOJ in the *USA* lawsuit and the author of the Mahoney report, testified that "[t]he nature of [the] atmosphere in the correctional facility really relies upon the relationship between staff and prisoners, and allegations even when falsely made and in some cases particularly when falsely made can have a negative impact on that kind of an atmosphere. It increas[es] friction. It increases mistrust. It puts both staff and inmates into a 'we and they' game, and I think in those situations it only serves to . . . reduce[] the positive correctional atmosphere and increases the potential of fear, of negative inferences." J.A. at 3242. Relatedly, Patrick McManus, a corrections consultant responsible for monitoring the MDOC's compliance with the *USA* agreement, testified that "prisons need to have a level of trust, confidence, comfort between staff and prisoners if they are going to function well," and that "it was in [the housing units] that the mistrust, the fear between the female prisoners and the male staff, was the most prominent and where it was likely to be the most corrosive." J.A. at 3090. Similarly, Director Martin testified that allegations create "friction between staff and prisoners that is counterproductive to safety and security in the prison." J.A. at 3290. Finally, Yukins testified that "allegations of sexual misconduct by female [inmates] on the male officers ha[ve] a very detrimental effect to the institution and to the employees and the prisoners." J.A. at 3614.

[24]George E. Sullivan, a corrections professional who had served as an expert for the DOJ in the *USA* lawsuit, testified that, in conversations with male officers at the Wayne Facility, the officers "were very candid in expressing their serious concerns, seeming even fearful of doing their jobs in the women's housing units risking a sexual harassment charge against them by female inmates. 'How could I explain such a charge to my wife or family,' asked one of them.'" J.A. at 3223. He opined that "male staff generally in women's prisons around the country, and especially at Western Wayne, do not, and will not (and in my opinion should not) conduct the security searches and procedures necessary to assure control over escape devices, weapons, illicit drugs, drug paraphernalia, and other serious contraband within the living spaces of female inmates. As a simple matter of their own self-consciousness and modesty, most male staff are very reluctant to search women's garments, personal care/sanitary items, observe them nude in showers or while using toilets." J.A. at 3224-25. Likewise, Camp testified that male officers "are tentative, that they are perhaps reluctant to engage female prisoners in a way that they would males to find out what was going on in a professional way, to be alert to the events in the institution or in the housing unit, to make rounds." J.A. at 3134. Finally, Mahoney testified that "[i]n order to run a facility, you have to supervise prisoners, and that requires observation on a regular basis. When staff may feel reluctant, particularly male staff, to view females in a state of undress, in the use of toilet facilities, in dressing, and other kinds of situations, they may reluctantly, not pursue vigorously their supervision requirements because of the natural reluctance to not do that." J.A. at 3243.

> The likelihood that inmates would assault a woman because she was a woman would pose a real threat not only to the victim of the assault also to the basic control of the penitentiary and protection of its inmates and other security personnel. The employees very womanhood would thus directly undermine her capacity to provide the security that is the essence of a correctional counselor's responsibility.

*Id.* at 336. Similarly, in the instant case, a "basis in fact" exists that "privacy screens" preclude proper surveillance of inmates and that allegations of sexual abuse engender hesitancy in male officers and mistrust between inmates and guards, and thus the "very manhood" of male COs and RUOs undermines their capacity to provide security.

The safety of inmates also indisputably relates to the essence of the MDOC's business, and the MDOC believes that it must eliminate males from the CO and RUO positions in the housing units in order to safeguard female inmates from sexual abuse. The defendants state that males perpetrate most of the sexual abuse in its female facilities, noting that, according to the plaintiffs' calculations, between 1994 and 2000, 189 of 208 allegations of sexual misconduct—including all of the sustained allegations—were made against male (officer and non-officer) employees, while the remaining 19 allegations were made against female employees or non-employees. J.A. at 700. The defendants also claim that sexual abuse most frequently occurs in the housing units, noting that, according to the MDOC's figures, 39% of the allegations of sexual misconduct arose in housing units, and that, according to the testimony of a MDOC expert, 57% of "alleged incidents" occurred in housing units. MDOC Br. at 8-9; R. 112, Tr. at 82. The defendants further argue that corrections officers commit a majority of the sexual abuse, noting that, according to the plaintiffs' figures, 125 of 208 allegations of sexual misconduct were lodged against male officers. J.A. at 700. Finally, while conceding that the vast majority of male COs and RUOs conduct themselves professionally, the MDOC contends that it cannot predict which officers will engage in sexual abuse.

The MDOC has established that the exclusion of male COs and RUOs from the housing units will decrease the likelihood of sexual abuse. As we have emphasized, the MDOC's decision receives "substantial weight," *Torres,* 859 F.2d at 1532, and, given the severity of the harm to sexually abused inmates, the MDOC may set "more stringent" qualifications for officer positions. *Harriss v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 676 (9th Cir. 1980) (quoting *Usery v. Tamiami Trail Tours, Inc.*, 531 F.2d 224, 236 (5th Cir. 1976)). As the data cited above shows, some male officers possess a trait precluding safe and efficient job performance—a proclivity for sexually abusive conduct—that cannot be ascertained by means other than knowledge of the officer's gender, and thus gender was "a legitimate proxy" for a safety-related job qualification. *Cf. Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 414-15 (1985) (applying "legitimate proxy" standard in an ADEA case. As the Ninth Circuit found in analogous circumstances, MDOC's decision to designate certain positions as female-only was "a reasonable response to concerns about inmate privacy and allegations of abuse by male [officers]." *Robino v. Iranon*, 145 F.3d 1109, 1111 (9th Cir. 1998).

The district court erred in concluding that the safety interests of female inmates did not support a BFOQ. The court reasoned that the MDOC's plan was not reasonably necessary because the MDOC had only recently implemented the reforms mandated by the *USA* and *Nunn* agreements, because improper conduct had decreased since the implementation of the reform, and because only a minuscule percentage of male officers sexually abuse inmates.[25] *Everson*, 222 F. Supp. 2d at 894-95. Further, the court relied on the lack of effort "to enhance pre-employment screening of new CO's and RUO's to lessen the likelihood of employing high risk male CO's and RUO's in the female prisons." *Id.* at 895.

---

[25] The district court found that allegations of "improper conduct" declined from 57 in 1998 (22 of which were sustained), to 40 in 1999 (of which 3 were sustained), to 25 in 2000 (none of which were sustained). *Everson v. Mich. Dep't of Corr.*, 222 F. Supp. 2d 864, 887 (E.D. Mich. 2002). The court did not identify the source of this data, define what constitutes "improper conduct," or explain whom the allegations were made against. *Id.* The plaintiffs state that, between 1994 and 2000, only 1.3% of the total number of male officers were involved in sustained allegations of sexual misconduct. Everson Br. at 39.

The district court applied too restrictive a standard in rejecting the MDOC's safety-based argument. Apparently, the court thought that the MDOC could establish a BFOQ only by showing that "all, or substantially all, males are not able to perform safely and efficiently the duties of a CO and RUO in the housing units in the female prisons." *Id.* However, as discussed above, the "all or substantially all" standard represents just one formulation of the "reasonable necessity" requirement, and the "impossible or highly impractical" standard better suits the instant case. No amount of sexual abuse is acceptable, and, given the gravity of the harm visited on the victims of sexual abuse, the MDOC permissibly eschewed the "wait-and-see" approach commended by the district court. None of the parties claims that the reforms mandated by the *USA* and *Nunn* agreements will completely eradicate sexual abuse, and the MDOC acted within the narrow confines of the BFOQ defense when it undertook a policy reasonably calculated to bring sexual abuse to an irreducible minimum.

The district court also erred in concluding that pre-employment screening constituted a reasonable alternative to a female BFOQ. Harley Stock, an expert for the plaintiffs, testified that the MDOC could reduce its risk of hiring applicants likely to engage in sexual abuse by instituting psychological testing and making other changes in its pre-employment screening. However, Stock conceded that (1) the tests he proposed do not measure a subject's proclivity for sexual abuse specifically, but instead place subjects into high risk categories that "might include such things as inappropriate sexual behavior" or assess "the ability to relate to members of the opposite sex," (2) he had not conducted follow-up studies to assess the accuracy of his testing methods, (3) his proposed testing is valid only for a year, and (4) he saw the testing of current employees as a "problem." R. 116, Tr. at 40-43, 47, 54-55. Given its speculative value, and its limited applicability, testing does not qualify as a reasonable alternative to gender-specific assignments.

The privacy rights of Michigan's female inmates also weigh in favor of a BFOQ. "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. "Thus, while inmates may lose many of their freedoms at the prison gate, they retain 'those rights [that are] not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration.'" *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (quoting *Hudson v. Palmer*, 468 U.S. 517, 523 (1984)). Our court has recognized that "a convicted prisoner maintains some reasonable expectations of privacy while in prison, particularly where those claims are related to forced exposure to strangers of the opposite sex, even though those privacy rights may be less than those enjoyed by non-prisoners."[26] *Cornwall v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *see also Kent v. Johnson*, 821 F.2d 1220, 1227 (6th Cir. 1987) (assuming that "there is some vestige of the right to privacy retained by state prisoners and that this right protects them from being forced unnecessarily to expose their bodies to guards of the opposite sex"). As one of our sister circuits has explained, most people "have a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating. When not reasonably necessary, that sort of degradation is not to be visited upon those confined in our prisons." *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981); *see also York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) ("We cannot conceive of a more basic subject of

---

[26]This court has found the "privacy" right against the forced exposure of one's body to strangers of the opposite sex to be located in the Fourth Amendment. *Cornwall v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987). Other courts have described this right as a liberty interest guaranteed by the Due Process Clause of the Fourteenth Amendment. *Sepulveda v. Ramirez*, 967 F.2d 1413, 1415 (9th Cir. 1992) (relying upon *Grummett v. Rushen*, 779 F.2d 491 (9th Cir. 1981)); *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963); *Rushing v. Wayne County*, 462 N.W.2d 23, 30 (Mich. 1990). Additionally, under certain circumstances, the invasion of an inmate's bodily "privacy" can violate the inmate's Eighth Amendment rights. For example, in *Jordan v. Gardner*, 986 F.2d 1521, 1531 (9th Cir. 1993) (en banc), the court held that a cross-gender clothed body search policy at a women's prison in Washington state constituted cruel and unusual punishment because many of the inmates had histories of sexual or physical abuse by men and because cross-gender bodily searches, even if conducted properly, would likely inflict psychological trauma on many of these inmates. Similarly, in *Kent*, 821 F.2d at 1227-28, this court held that a male inmate had stated a claim under the Eighth Amendment for purposes of Rule 12(b)(6) of the Federal Rules of Civil Procedure by alleging that "female prison guards have allowed themselves unrestricted views of his naked body in the shower, at close range and for extended periods of time, to retaliate against, punish and harass him for asserting his right to privacy."

privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").[27]

Courts have recognized that this privacy interest can justify the exclusion of male officers from certain positions in female prisons. In *Robino v. Iranon*, a Hawaii women's correctional center asserted that the female gender was a BFOQ for 6 out of 41 corrections officer positions at a women's correctional center because the restriction was reasonably necessary to accommodate the privacy interests of the inmates, and to reduce the risk of sexual conduct between the officers and inmates. 145 F.3d 1109, 1110 (9th Cir. 1998). The positions at issue raised privacy concerns in that they were "residential" and required the officer on duty "to observe the inmates in the showers and toilet areas for the prison's own security or provide[d] unsupervised access to the inmates." *Id.* at 1111. Accepting the BFOQ argument, the court found the policy "a reasonable response to the concerns about inmate privacy and allegations of abuse by male [officers]." *Id.* Similarly, in *Tharp v. Iowa Department of Corrections*, the court upheld a policy that assigned only female officers to the women's unit of a mixed-gender minimum security prison in Iowa. 68 F.3d 223, 224 (8th Cir. 1995). Among other duties, the officers conducted room searches, urinalysis tests, and strip and pat-down searches of inmates, though only female staff—either female officers or, if none were available, less trained female staff—conducted urinalysis and personal searches. *Id.* Without even reaching the BFOQ issue, the court deemed the policy a "reasonable gender-based job assignment policy" because, among other things, it addressed "female inmate privacy concerns." *Id.* at 226; *see also Carl v. Angelone*, 883 F. Supp. 1433, 1442 n.3 (D. Nev. 1995) (stating that a BFOQ might be justified on the ground of "simple decency in order to afford female inmates as much privacy as possible, even if not constitutionally mandated or protected").[28]

The MDOC's policy similarly advances the privacy interests of Michigan's female inmates. The housing unit serves as inmates' "home," the place where they "let their hair down" and perform the most intimate functions like "like showering, using the toilet, dressing, even sleeping." J.A. at 3089, 3371. In the housing units, inmates spend a great deal of time in close contact with the officers, who supervise "the most intimate aspects of an inmate's life in prison, what time they go to sleep, where they sleep, when they get up, brush their teeth, use the restroom, shower, dress." J.A. at 3369; *see also* J.A. at 3291, 3368. Inmates must request sanitary napkins and other personal items from the officers. J.A. at 3565. Given these circumstances, the MDOC, in Martin's words, determined that "sound correctional practices" and "simple human decency" dictated the exclusion of males from CO and RUO positions in the housing units. J.A. at 3292.

The MDOC has instituted "privacy screens" to address the most severe invasions of privacy, but these measure are not failsafe. The MDOC has provided inmates with screens for their cell windows, but these screens do not cover the entire window and a male of "average height" can see over them. J.A. at 3147; *see also* J.A. at 3154. Officers can also see over the doors on the toilet stalls. J.A. at 3531. Opaque curtains shield inmates from view while they shower, but they are exposed when they reach outside the stall for a towel. R. 118, Tr. at 170, 242; *see also* R. 120, Tr. at 33-34; J.A. at 3564. Finally, although male staff

---

[27]Of course, as important this right may be, it must yield to the needs of prison administration. Thus, courts evaluate prison policies that infringe on the privacy rights under a "rational relationship" that provides that a policy is valid if "reasonably related to legitimate penological interests." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Factors to consider in applying this standard include, "(1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest . . . ; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation." *Id.* at 917.

[28]We note that courts have identified "privacy" as a basis for a BFOQ in other contexts as well. *See, e.g., Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 133 (3d Cir. 1996) (child care specialist at psychiatric hospital); *Hernandez v. Univ. of St. Thomas*, 793 F. Supp. 214, 218 (D. Minn. 1992) (janitor in female dormitory); *Local 567 Am. Fed. of State, County, & Mun. Employees v. Michigan Council 25*, 635 F. Supp. 1010, 1014 (E. D. Mich. 1986) (attendants at mental health care facility).

are required to knock and announce before entering places where female prisoners are likely to be in a state of undress, such as a bathroom or a shower facility, the "announcements" are frequently inaudible to the inmates. R. 118, Tr. at 243; J.A. at 3378. Thus, even with these privacy screens, prurient male officers have ample opportunity to gaze upon inmates in a state of undress, and even the most professional officers are liable to intrude on the privacy of inmates unintentionally. Moreover, these privacy screens do not address the fear of unwanted viewing experienced by many inmates, some of whom have a history of physical or sexual abuse by men.

The MDOC has made a reasonable determination that its plan will protect the privacy rights of its female inmates. Regardless of whether its current conditions violate the constitutional rights of its inmates, a prison may invoke the BFOQ defense to justify measures taken to enhance inmate privacy. *Robino*, 145 F.3d at 1111; *Carl*, 883 F. Supp. at 1442 n.3. Thus, the goal of "privacy" provides support for the MDOC's BFOQ defense.

In rejecting the MDOC's privacy-based argument, the district court erroneously determined that inmate privacy did not go to the "essence" of the MDOC's business. The court found that "there is nothing in any publication of the MDOC to suggest that the 'privacy of prisoners, especially female, as the term is conventionally used, is a mission of the MDOC.'" *Everson*, 222 F. Supp. 2d at 878. But, as quoted a few pages earlier in the court's opinion, the "position descriptions" for the CO and RUO positions state that the "goal is to provide a safe, clean, secure, and efficient living environment *while respecting the privacy of female prisoners*, and enforcing rules and regulations." *Id.* at 867; J.A. at 3737, 3744, 3756 (emphasis added). Additionally, in his report, Mahoney stated that the MDOC has hired him "to determine whether certain custody positions at . . . women's facilities should be filled only by female custody staff or if there is a less intrusive means to ensure the safety and *reasonable privacy needs* of female inmates." J.A. at 1426 (emphasis added). More importantly, when determining whether a particular job qualification relates to the "essence" of the employer's business, a court must undertake a functional analysis of the employer's business, and not simply look to the employer's mission statement or other documentation. Here, given the MDOC's legal responsibility to safeguard the privacy rights of its inmates, Director Martin's statement that respecting the privacy interests of female inmates represents "sound correctional practice" and "basic human decency," and our common-sense understanding of corrections practice, it is beyond cavil that "privacy" relates to the essence of the MDOC's business.

In rejecting the MDOC's argument for a BFOQ, the district court stressed that the MDOC's plan departed from national norms. The court found that "standard practices nationwide provide for the employment of male corrections officers in female prisons" and that "there is nothing unique about the operation of the female prisons in Michigan." *Everson*, 222 F. Supp. 2d at 893. The court further found that "the published literature on the presence of male correctional officers in female prisons does not support a female BFOQ for corrections officer in the housing units in a female prison." *Id.* at 894. In short, the court reasoned that, because the MDOC's plan deviated from standard practice, the plan was not reasonably necessary to the normal operation of Michigan's female prisons.

The district court committed legal and factual error by using standard practice as a yardstick for the reasonable necessity of the MDOC's plan. In determining whether gender-based discrimination constitutes a BFOQ, a court must examine the particular circumstances of the individual employer, and not simply rely on generalizations about an industry or a group of employers, as the district court did. *See Dothard*, 433 U.S. at 336 n.23; *Torres*, 859 F.2d at 1529. Additionally, "appraisals need not be based on objective, empirical evidence, and common sense and deference to experts in the field may be used" to establish a BFOQ. *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 132 (3d Cir. 1996); *see also Torres*, 859 F.2d at 1531; *cf. Wittmer v. Peters*, 87 F.3d 916, 920 (7th Cir. 1996) (substantial deference accorded to experts in a constitutional challenge to state's hiring preference for African-American lieutenants in penal boot camp). Both of these precepts are especially true where the employer is a prison administrator that "must be allowed to adopt innovative solutions to the intractable problems of prison administration." *Torres*, 859 F.2d at 1529 (quoting *Turner v. Safley*, 482 U.S. 78, 107 (1987)). Placing the straightjacket of standard

practices on prison officials, as the district court did, would deprive of them of the ability "to innovate and experiment," to the detriment of the inmates and society in general. *Id.*

In addition to this legal error, the district court clearly erred in finding "nothing unique" about Michigan's female prisons. In reaching this conclusion, the district court inexplicably failed to address Michigan's deplorable record regarding the care of its female inmates, which, absent evidence to the contrary, we must assume sets it apart from other states. In light of the endemic problem of sexual abuse, it was incumbent upon the MDOC to act decisively and creatively, and the lessons of *Torres* apply with special force. As Martin testified, and as we agree,

> the [MDOC's] plan to assign only females in the housing units . . . challenges the thinking of the past 15 years or so that officers are officers and prisoners are prisoners no matter what their gender, but the [MDOC's] staff and prisoners have paid a high price for going along with this conventional wisdom and I believe that I should be given the flexibility to exercise my best judgment on staffing the housing units to make our female prisons as safe and secure as they can be for the staff, the prisoners, and the public.

J.A. at 3295. In brief, given the case-by-case nature of the BFOQ analysis, the flexibility afforded prison administrators, and the MDOC's unique history, the lack of a national consensus does not mean that the female gender is not a BFOQ for CO and RUO positions in Michigan's female prisons.

The district court also erred in finding that there are "reasonable alternatives" to the MDOC's plan. As noted above, an employer invoking the BFOQ defense has the burden of establishing that there are no reasonable alternatives to discrimination. *Reed*, 184 F.3d at 600. In addition to pre-employment screening, which is discussed above, the district court identified the following alternatives to female-only staffing of the CO and RUO positions in the housing units: covering vacancies with females; increasing female coverage where necessary with overtime; redeployment of female officers in supervisory positions; and eliminating the policy that each CO and RUO conduct five pat-down searches per shift. *Everson*, 222 F. Supp. 2d at 895.

The MDOC has demonstrated that the district court erred in deeming these proposals "reasonable alternatives" to gender-specific staffing. First, the proposal to fill vacancies with female officers is simply a watered-down version of the MDOC's plan; the district court did not explain why it is permissible under Title VII to move to female-only staffing in the housing units through attrition but not through the immediate transfer of males to other positions. Second, increasing coverage with overtime is self-evidently expensive and inefficient. In fact, the Securicor study—the source of the proposal—stated that increasing coverage with overtime "is not a satisfactory long-term solution" for many reasons, including "the amount of time spent by supervisors to schedule overtime, staff burnout, and decreased staff effectiveness, as well as the fiscal cost of overtime." J.A. at 989; *see Reed*, 184 F.3d at 600 (holding that an option that would place "financial strains" on a county jail by requiring the payment of overtime, and that would "cause fatigue" in a jail employee, was not a reasonable alternative). Third, neither the district court nor the plaintiffs have explained how the redeployment of female supervisors to the housing units at the female prisons would cure problems stemming from the very presence of male COs and RUOs in the housing units. Fourth, the MDOC has already instituted a moratorium on pat-downs of female inmates by male officers, so this measure would not increase inmate safety or privacy. Moreover, the moratorium on pat-down searches impairs the ability of the male officers to protect the security of the prison and the safety of the inmates.

Before concluding, we emphasize the limited nature of our holding. We do not hold that gender constitutes a BFOQ for corrections officers in female prisons outside of Michigan. Nor do we hold that gender constitutes a BFOQ for positions in Michigan's female prisons beyond the approximately 250 positions we have discussed. Nor do we have occasion to address whether the male gender can ever be a BFOQ for a corrections officer position at a male prison. Rather, we simply conclude that, given the

endemic problem of sexual abuse in Michigan's female facilities, given the constellation of issues addressed by the MDOC's plan (security, safety, and privacy), and given the deference accorded the MDOC's judgment, the MDOC's plan is reasonably necessary to the normal operation of its female prisons.

## CONCLUSION

The district court prefaced its decision with a famous quotation from Alexis de Toqueville: "There is hardly ever a political question in the United States which does not sooner or later turn into a judicial one." *Everson*, 222 F. Supp. 2d at 865 (quoting *Democracy in America* 248 (J.P. Moyer & Max Lerner eds., Harper & Row 1996) (1832)). This apothegm indeed illuminates the present dispute, though not in the manner suggested by the district court. The MDOC's appeal is before this court not because Director Martin "made a decision and tried to translate the decision into a courtroom judgment," *id.* at 899, but rather because, among other errors, the district court failed to accord proper deference to the decision of a state political actor, the MDOC, when individuals challenged that decision by filing suit in federal court rather than through the political process. For this reason, and for the other reasons discussed above, we **REVERSE** the judgment of the district court and **REMAND** with instructions to dismiss the complaint.

—————————

## **DISSENT**

—————————

RONALD LEE GILMAN, Circuit Judge, dissenting. I disagree with the majority's conclusion that being a female is a bona fide occupational qualification (BFOQ) for approximately 250 Correctional Officer (CO) and Residential Unit Officer (RUO) positions in prisons for women inmates managed by the Michigan Department of Corrections (MDOC). In reaching its conclusion, the majority repeatedly stresses the importance of giving "due regard to the professional judgment of the MDOC." Although the judgments of prison officials are "entitled to substantial weight when they are the product of a reasoned decision-making process, based on available information and experience[,]" *Torres v. Wis. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1532 (7th Cir. 1988) (en banc), the factual findings of the district court following a bench trial are also entitled to substantial deference. *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

The district court made several key findings of fact that I believe have not been adequately considered by the majority. First, the district court concluded that standard practice in the corrections field is to allow the employment of males in female prisons, even though the male employees may be limited in the scope of the tasks that they are permitted to perform. Second, the court found that internal studies by the MDOC did not support the wholesale elimination of male COs and RUOs from the housing units in the female prisons. The studies recommended that various tasks be assigned on a gender-specific basis and that the number of female COs be increased in the female housing units, but they did not recommend a female BFOQ for these positions. Third, the court concluded that the professional concern over cross-gender supervision in Michigan prisons was essentially limited to that of Bill Martin, the then-current director of the MDOC who requested the BFOQ certification. Martin was not someone with extensive experience in prison policy and administration, nor did he consider the recommendations of the department's internal studies or consult with other senior managers of the MDOC.

Despite these factual findings by the district court, the majority has accepted the conclusion that gender is a BFOQ in this case, a determination reached by Martin and "rubber-stamped" by the MDOC without consultation or study. Unlike the situation in *Robino v. Irano*, 145 F.3d 1109 (9th Cir. 1998), upon which the majority relies, the MDOC did not "conduct[ ] an extensive survey of post duties before determining which posts should be designated female-only." *Id.* at 1111. The MDOC's BFOQ determination, because it was not the "product of a reasoned decision-making process, based on available information and experience[,]" *Torres*, 859 F.2d at 1532, should be afforded less deference than we would otherwise give the professional judgment of prison officials.

I also believe that the majority's reliance on the *Torres* decision is unjustified. At issue in *Torres* was whether the district court erred in rejecting the prison officials' contention that a female BFOQ for correctional officer positions was necessary to further the goals of inmate rehabilitation, security, and privacy. 859 F.2d at 1526. The Seventh Circuit held that, with respect to the goal of inmate rehabilitation, the district court had erred in requiring the defendants to produce objective, empirical evidence of the need for a BFOQ, and remanded the case so that the district court could consider the totality of the circumstances. *Id.* at 1532. But with respect to the goals of security and privacy, the court affirmed the district court's determination that the various methods the prison had adopted to address the privacy concerns of female inmates, such as the use of "privacy cards" and limiting male guards' observation of unclothed female inmates, had not undermined prison security. *Id.* at 1526, 1528. It explained that "the decision of the district court that the defendants' BFOQ plan cannot be justified by concerns for *prison security* or for the basic *privacy rights* of the inmates is correct in law and fact." *Id.* at 1528 (emphasis added).

Here, however, the majority concludes that the female BFOQ *is* necessary to advance the goals of prison security and prisoner safety, even though the district court determined that changes implemented as a part of the settlement agreements referred to in the majority opinion—including the "knock and announce"

policy, restricting pat-down searches of inmates by male staff, and limiting male officers' views of areas where inmates dress, shower, and use the toilet—made a female BFOQ unnecessary. Thus, although *Torres* stands for the proposition that the reasoned judgment of prison officials should be given special consideration, it also supports the district court's conclusion that a female BFOQ is not necessary or appropriate for the purposes of prison security and privacy rights.

Finally, I believe that the district court was correct when it called for the use of "a scalpel rather than a meat ax approach to staffing tasks in the female prisons." *Everson v. Mich. Dep't of Corr.*, 222 F. Supp. 2d 864, 896 (E.D. Mich. 2002). A reasonable alternative to the complete exclusion of males from the CO and RUO positions is the assignment of sensitive tasks to female correctional officers. In concluding its opinion, the district court held that

> there is no justification for a blanket ban on employment of male corrections officers in the female prisons of Michigan. The MDOC has the right to limit certain tasks in the female prisons to female corrections officers, particularly to ensure female inmates' rights to privacy[,] bearing in mind at all times the security interest of the corrections officers. . . . There are tasks in the running of a female prison as has been explained above which should not be performed by male correction officers such as strip searches and body cavity searches. It should not be difficult to define these tasks and adjust CO and RUO duties in the housing units in the female prisons accordingly. Nothing in the decision here to deny the BFOQ's requirement should be read to prohibit the MDOC officials from making gender specific task assignments. The vast majority of female prisons in the United States appear to manage their populations safely and efficiently and still comply with the requirements of equal employment opportunity laws. Nothing in the record here suggests the MDOC can not do the same thing.

*Id.* at 898-99. I fully agree with this assessment.

Other courts that have addressed this precise issue have reached the same conclusion. *See, e.g., Forts v. Ward*, 621 F.2d 1210, 1216-17 (2d Cir. 1980) (affirming the portion of the district court's decision that balanced the conflict between male guards' employment rights and female inmates' privacy rights by "carefully tailored adjustments to either facilities or work assignments[,]" and vacating that portion of the decision that categorically prohibited the assignment of male guards to nighttime shifts); *Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079, 1086 (8th Cir. 1980) (holding that in order for a male prison to show that the hiring of women for guard positions was unworkable, the prison "must also demonstrate that it could not reasonably rearrange job responsibilities in a way to minimize the clash between privacy interests of inmates and the nondiscrimination principle of Title VII").

Given that gender-sensitive task assignment is a preferred alternative to the wholesale exclusion of males from the positions in question, I believe that the majority has erred in holding that being a female is a BFOQ for those positions. The fact that the overwhelming weight of judicial authority agrees should make us all the more cautious in finding that a BFOQ exists in this case. Accordingly, I would **AFFIRM** the decision of the district court.