**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EDWARD C. BREINER; LOREN
CHAPULIN; JIMMIE MCNEAL; RANDY
STOUT,
    *Plaintiffs-Appellants,*

v.

NEVADA DEPARTMENT OF
CORRECTIONS; STATE OF NEVADA;
GLEN WHORTON; JACKIE CRAWFORD,
    *Defendants-Appellees.*

No. 09-15568

D.C. No.
2:05-CV-01412-
KJD-RJJ

OPINION

Appeal from the United States District Court
for the District of Nevada
Kent J. Dawson, District Judge, Presiding

Argued and Submitted
February 11, 2010—San Francisco, California

Filed July 8, 2010

Before: John T. Noonan, Marsha S. Berzon and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Berzon

9671

**COUNSEL**

John B. Marcin, Las Vegas, Nevada, for the plaintiffs-appellants.

Roger R. Madsen, Deputy Attorney General, Catherine Cortez Masto, Attorney General, Las Vegas, Nevada, for the defendants-appellees.

**OPINION**

BERZON, Circuit Judge:

The Nevada Department of Corrections (NDOC) hires only female correctional lieutenants at a women's prison. The district court granted summary judgment upholding NDOC's discriminatory employment policy, concluding that the policy imposed only a "de minimis" restriction on male prison employees' promotional opportunities and, alternatively, that the policy falls within Title VII's exception permitting sex discrimination in jobs for which sex is a bona fide occupational qualification, 42 U.S.C. § 2000e-2(e)(1). We reverse as to both holdings.

FACTUAL & PROCEDURAL BACKGROUND

In September 2003, NDOC's Inspector General learned that a female inmate at the Southern Nevada Women's Correc-

tional Facility (SNWCF) had been impregnated by a male guard. At the time, SNWCF was operated by a private company, Corrections Corporation of America (CCA). The pregnant inmate alleged that her relationship with the guard stemmed from CCA's refusal to provide the psychotropic medications she had long been prescribed to treat her schizophrenia. NDOC Director Jackie Crawford acknowledged that her office had received a number of complaints concerning medical issues at SNWCF. At Crawford's direction, the Inspector General interviewed approximately 200 inmates about "their personal experiences with the medical function at [SNWCF]." Nearly all the inmates reported receiving substandard medical treatment.

In the course of the investigation, the Inspector General also discovered that SNWCF had become "an uninhibited sexual environment." He noted "frequent instances of inappropriate staff/inmate interaction," "flirtatious activities between staff and inmates," and "widespread knowledge" of "long-term inmate/inmate sexual relationships." In exchange for sex, prison staff "routinely introduce[d] . . . contraband into the institution, including alcohol, narcotics, cosmetics, [and] jewelry." The inmates' sexual behavior—which they freely admitted was designed to "compromise staff and enhance inmate privileges"—was, in the Inspector General's view, "predictable." The Inspector General attributed the guards' misconduct to "a lack of effective supervisory management oversight and control. . . . There is no evidence that supervisors or managers recognize this risky behavior or do anything to stop it." To address this "leadership void," the Inspector General recommended that "line supervisors undergo leadership training" and that "subordinate staff undergo re-training with emphasis on inmate con games and ethical behavior."

In the wake of the Inspector General's report, which ignited "very high profile" media coverage, CCA announced that it was terminating its contract to operate SNWCF. NDOC

resumed control of the facility and, according to Crawford, faced intense political pressure to "mitigate the number of newspaper articles" and to "assure the State of Nevada that we would not be embarrassed like this again." To achieve this goal, Crawford decided to restaff the facility so that seventy percent of the front line staff at SNWCF would be women.

Crawford also decided to hire only women in SNWCF's three correctional lieutenant positions. The correctional lieutenants are shift supervisors and are the senior employees on duty seventy-five percent of the time. Correctional lieutenants report to wardens or deputy wardens and are responsible for supervising the prison's day-to-day operations, including directing the work of subordinate staff, inspecting the facility and reporting infractions, and monitoring inmates' activities and movement through the facility. There is one correctional lieutenant assigned to SWNCF per shift. Although the correctional lieutenant posting specified that "only female applicants will be accepted for these positions," several males applied for the positions, which were eventually filled by three women.

Edward Breiner, Loren Chapulin, Jimmie McNeal and Randy Stout, the present plaintiffs, all male Nevada correctional officers, were not among the men who applied for the SNWCF correctional lieutenant positions. They nonetheless filed charges with the Equal Employment Opportunity Commission, received notice of their right to sue, and filed suit alleging that the state's decision to limit the correctional lieutenant positions to women violated Title VII's prohibition on sex discrimination in employment.[1]

The district court granted NDOC's motion for summary judgment, holding that the gender restriction on the three cor-

---

[1]The only claim before us is a Title VII claim against NDOC with regard to the correctional lieutenant positions. The seventy-percent-female restriction on front line guards is not at issue in this litigation.

rectional lieutenant positions at SNWCF had a "de minimis" impact on the plaintiffs' overall promotional opportunities within NDOC, and that it was therefore unnecessary to decide whether the positions fell within Title VII's exception for jobs in which sex is a bona fide occupational qualification (BFOQ), 42 U.S.C. § 2000e-2(e)(1). Alternatively, the district court concluded that NDOC had carried its burden of proving that "gender constitutes a BFOQ for the three correctional lieutenant posts at SNWCF," because the restriction was designed to meet "NDOC's goal of reversing the very real and documented problems at SNWCF."[2] This timely appeal followed.

## STANDING

NDOC argues for the first time on appeal that because the plaintiffs did not apply for the NDOC positions and would not have been selected anyway for reasons other than their sex, they lack standing to pursue their Title VII claim. As standing is a jurisdictional requirement, we must consider NDOC's argument before reaching the merits of the plaintiffs' Title VII claim. *See Pritikin v. Dep't of Energy*, 254 F.3d 791, 796 (9th Cir. 2001). We review the plaintiffs' standing de novo, *Mayfield v. United States*, 599 F.3d 964, 970 (9th Cir. 2010), and conclude that Stout, at least, has standing, as we now explain.

[1] To have standing in this case, a plaintiff must demonstrate a "concrete and particularized" injury, "fairly traceable" to NDOC's discriminatory policy, and "likely" to be "redressed by a favorable decision" of this court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks, brackets and ellipses omitted). That the

---

[2]The district court denied without analysis several evidentiary objections raised by the plaintiffs. As we reverse the grant of summary judgment on other grounds, we do not reach the plaintiffs' contention that the rejection of their objections was error.

plaintiffs did not apply for the correctional lieutenant positions does not preclude them from establishing such an injury. A nonapplicant suffers "an invasion of a legally protected interest," *id.* at 560, under Title VII if "he would have applied for the job had it not been for [the employer's discriminatory] practices." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 368 (1977). To prevail on the merits as nonapplicants, the plaintiffs must show that they were "discouraged from applying" rather than that they "simply failed to do so." *Yartzoff v. Thomas*, 809 F.2d 1371, 1374 (9th Cir. 1987); *see also Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 761-62 (9th Cir. 1980).

**[2]** Stout had previously applied for correctional lieutenant positions. He declared under oath that he was deterred from applying for the SNWCF positions "by [his] knowledge that [his] application would be futile because of the defendant's discriminatory policy." This evidence is sufficient on summary judgment to establish Stout's standing under the case law applicable to nonapplicants.

NDOC contends that, whether or not the gender restrictions discouraged the plaintiffs from applying, none of them would have qualified for the SNWCF positions even if they had been open to applicants of both sexes. Applicants for the SNWCF correctional lieutenant positions were required to possess one year of experience as a correctional sergeant (the rank below correctional lieutenant) in the state of Nevada, or "an equivalent combination of education and experience." Stout had been a correctional sergeant since 1998. NDOC's own personnel analyst affirmed that Stout "would have qualified for a correctional lieutenant position with NDOC in 2004."

NDOC's assertion that Stout was ineligible for the SNWCF positions because "he had expired from the Correctional Lieutenant certification list" is not supported by the record. The posting for the correctional lieutenant positions specified that applicants must possess a driver's license, pass a drug test,

and satisfy Nevada's "P.O.S.T. requirements" (police officer standard training),[3] but contained no reference to a "certification list." Indeed, Crawford stated that "people who had applied [for the correctional lieutenant positions] had to go back up through personnel to make sure they met those qualifications . . . for the lieutenant. And, then, I get a certified list . . . that means State Personnel has screened and has certified a list that we, then, have to work from." This statement makes clear that a list was created of all qualified applicants; inclusion on the list was not a preapplication job requirement. Moreover, even if such a preapplication list existed, there is no basis for concluding that Stout could not have renewed his eligibility in time to apply for the positions had he not been dissuaded from doing so by the female-only restriction.

**[3]** In sum, we conclude that besides the female-only restriction, "there was no other qualification standard that prevented [Stout] from applying for the job. He accordingly satisfies the injury, causation, and redressability prongs of *Lujan*, and therefore has standing." *Bates v. UPS, Inc.*, 511 F.3d 974, 988 (9th Cir. 2007) (en banc). As Stout, at least, has standing to pursue this appeal, we need not determine whether Chapulin and McNeal have standing to seek relief under Title VII. *See id.* at 985.

## TITLE VII CLAIM

**[4]** It is unlawful, with narrow exceptions, "to fail or refuse to hire . . . any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Failure to promote is actionable under Title VII. *See*, *e.g.*, *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1121-22 (9th Cir. 2004). NDOC con-

---

[3]NDOC does not argue that these requirements would prevent Stout from qualifying for the positions.

cedes that its refusal to consider men for the correctional lieutenant positions at SNWCF is facially discriminatory.

The district court granted summary judgment to NDOC on two alternative grounds. First, the district court concluded that NDOC's refusal to hire male correctional lieutenants at SNWCF had a negligible impact on the plaintiffs' promotional opportunities in light of the correctional lieutenant positions available statewide to employees of both sexes. The district court held that this "de minimis" discrimination was not actionable under Title VII. Second, the district court held that, even if actionable, the gender restriction on correctional lieutenant positions at SNWCF fell within Title VII's BFOQ exception for "those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of [a] particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1). We review the grant of summary judgment de novo, *McDonald v. Sun Oil Co.*, 548 F.3d 774, 778 (9th Cir. 2008), and reverse as to both grounds.

## A.   The "De Minimis" Theory

NDOC asserts that the three SNWCF positions were the only correctional lieutenant promotions in the NDOC system as a whole restricted to women applicants and that twenty-nine out of thirty-seven correctional lieutenant positions filled over a four year period went to men. Relying on these statistics, NDOC maintains that the concededly discriminatory policy of excluding men from the SNWCF correctional lieutenant positions had only a "de minimis" impact on the plaintiffs and so did not violate Title VII with regard to them. This conclusion reflects a fundamental misunderstanding of the basic precepts of Title VII and is not supported by our case law.

[5] It is beyond dispute that the denial of a single promotion opportunity such as the one here at issue is actionable under Title VII. *See Ricci v. DeStefano*, 129 S. Ct. 2658, 2671

(2009) (finding for plaintiffs who "were denied a chance at promotions"); *Alvarado v. Tex. Rangers*, 492 F.3d 605, 612 (5th Cir. 2007) ("It is . . . well established . . . that the denial of a promotion is an actionable adverse employment action.") (emphasis omitted); *McGinest*, 360 F.3d 1121-22. Whether there will be other promotional opportunities for which the person may become eligible has never been a consideration.

Here, for example, the correctional lieutenant position pays more than the correctional sergeant job. It is also a prerequisite for the more senior, more responsible, and higher paying position of associate warden. That another opportunity may later arise for which the applicant is eligible does not negate the injury of being denied an earlier position on the basis of one's sex, with the resulting loss of pay for a period and delayed eligibility for another promotion.

**[6]** Stout, for instance, was later promoted to correctional lieutenant, but had he been promoted to a SNWCF position, he would have earned more during the period before his eventual promotion and would have become eligible for promotion to an associate warden position two years earlier than he did. Moreover, correctional lieutenant jobs in Nevada prisons are not fungible from the point of view of employees, as illustrated by Stout's declaration that the SNWCF positions were desirable to him because the facility's location "would not have required selling my house and causing my wife to quit her job to relocate." As Stout's example demonstrates, an employee who is denied a promotion on the basis of sex but later promoted has not been "restor[ed] to the position in which [he] would have been absent the discrimination." *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1518 (9th Cir. 1989), *overruled on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1988).

**[7]** Further, Title VII is offended when an *individual* suffers discrimination with respect to a particular adverse employment decision, even if others of the same protected

group are not similarly disadvantaged. *See Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 579 (1978) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination."). The fact that *on average* men are more likely than women to be hired into correctional lieutenant positions might have some relevance if NDOC disputed the discriminatory nature of the policy. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000) (holding that the existence of many similarly situated employees over age 50 was "relevant, [but] certainly not dispositive" of the employer's lack of intent to discriminate against the plaintiff on the basis of age). It has no bearing, however, on the question whether a man denied a specific promotional opportunity expressly on the basis of his sex can establish a Title VII violation. "[T]he obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of [sex], without regard to whether members of the applicant's [sex] are already proportionately represented in the work force." *Furnco*, 438 U.S. at 579. Put another way, Title VII protects the ability to pursue one's own career goals without being discriminated against on the basis of race or sex, even if others of the same race or sex were not subject to disadvantage.

In holding otherwise, the district court relied on *Robino v. Iranon*, 145 F.3d 1109 (9th Cir. 1998) (per curiam). *Robino*, however, is inapposite. The policy at issue in *Robino* restricted job responsibilities, not employment or promotional opportunities. *Id.* at 1110. *Robino* does not suggest—nor could it, for the reasons we have discussed—that a refusal to hire an individual because of sex can be considered "de minimis" because others of the same sex were hired.

Specifically, *Robino* concerned prison officials' decision to assign only female guards to six "posts" in a women's prison —those from which the guard could observe inmates in the shower—to "accommodate the privacy interests of the female inmates and reduce the risk of sexual conduct between

[guards] and inmates.'"**4** *Id.* The plaintiffs in *Robino* were cur-
rent male guards complaining that female guards—individuals
holding the same position—were to a limited degree given
different job assignments within the same job category. It was
in this context that *Robino* held that the post-restriction policy
"limits eligibility for such a small number of positions (six
out of forty-one) that it imposes such a *de minim[i]s* restric-
tion on the male [guards'] employment opportunities." *Id.*

Thus, the restriction in *Robino* was "de minimis" not, as the
district court thought, because a small proportion of positions
were affected, but because "male [guards had] not suffered
any tangible job detriment beyond a reduced ability to select
their preferred watches." *Id.*; *see also Jordan v. Gardner*, 986
F.2d 1521, 1527 (9th Cir. 1993) ("The conflict between the
right of [male guards] not to be discriminated against in job
opportunities and [female inmates] to maintain some level of
privacy has normally been resolved . . . through adjustments
in scheduling and job responsibilities for the guards." (quota-
tions and citation omitted)); *Tharp v. Iowa Dep't of Corr.*, 68
F.3d 223, 226 (8th Cir. 1995) (approving a policy that
restricted four out of sixteen shifts to women); *Hardin v.
Stynchcomb*, 691 F.2d 1364, 1373 (11th Cir. 1982) ("Since
the majority of . . . positions in the male section of the jail do
not require . . . observation of inmates' use of shower or toilet
facilities, . . . modification of the system of rotating . . .
assignments will avoid the clash between privacy rights and
equal employment opportunities.").

**[8]** *Robino*'s premise, then, was necessarily that a minor
impact on job assignments was too minimal to be actionable.

---

**4**Although the opinion is not pellucid on this point, the briefs in *Robino*
make clear that a "post" is an assignment to a particular geographic loca-
tion. Not all of the twenty-one "posts" were staffed on all shifts (or
"watches"). A total of forty-one posts were staffed in a twenty-four hour
period. *See* Brief of Defendant-Appellee at 6, *Robino*, 145 F.3d 1109 (No.
97-16470).

This very limited concept has no application to NDOC's policy. An employer's "fail[ure] or refus[al] to hire" on the basis of sex is, without limitation, actionable under Title VII. 42 U.S.C. § 2000e-2(a)(1). NDOC's refusal to hire men in the correctional lieutenant positions therefore violates Title VII unless NDOC can demonstrate that gender is a BFOQ for the positions. NDOC cannot meet that burden, as we now explain.

## B.   Gender as a Bona Fide Occupational Qualification

[9] Title VII's BFOQ exception provides:

> [I]t shall not be an unlawful employment practice for an employer to hire and employ employees . . . on the basis of [ ] religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

42 U.S.C. § 2000e-2(e)(1). As its language indicates, *see Int'l Union, UAW v. Johnson Controls*, 499 U.S. 187, 201 (1991), the BFOQ is an "extremely narrow exception to the general prohibition of discrimination on the basis of sex" that may be invoked "only when the *essence* of the business operation would be undermined" by hiring individuals of both sexes. *Dothard v. Rawlinson*, 433 U.S. 321, 333-34 (1977) (citing *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385, 388 (5th Cir. 1971)). To justify discrimination under the BFOQ exception, an employer must

> prove by a preponderance of the evidence: 1) that the job qualification justifying the discrimination is reasonably necessary to the essence of its business; and 2) that [sex] is a legitimate proxy for the qualification because (a) it has a substantial basis for believing that all or nearly all [men] lack the qualification, or . . . (b) it is impossible or highly impractical . . .

>   to insure by individual testing that its employees will
>   have the necessary qualifications for the job.

*EEOC v. Boeing Co.*, 843 F.2d 1213, 1214 (9th Cir. 1988)
(quotations omitted).

NDOC has not explicitly articulated the "job qualification"
for correctional lieutenants for which it claims sex is a legiti-
mate proxy. We are left to try to adduce what that "qualifica-
tion" might be from the declarations by NDOC officials on
which the defendants rely in their briefs as justification for the
facially discriminatory policy.

NDOC Director Crawford offered the following explana-
tion for the decision to exclude men from the correctional
lieutenant positions:

- [T]he number of officers who were supervisors
  [when CCA operated the facility] were males . . .
  They were the individuals who alleged that they
  did not know anything about the drugs, alcohol,
  and sex.

- [Correctional lieutenants] are the individuals that
  can monitor and best, you know, gauge if there is
  something going on.

- We wanted upper management to be able to mon-
  itor, to understand, and notice anything that went
  on. We had so many people telling us during the
  private sector that nothing was going on. . . . We
  just felt comfortable with doing this.

Glen Whorton, the director of NDOC from 2005 to 2007,
declared that

>   the employment of male correctional lieutenants at
>   SNWCF would create a real risk . . . if female

inmates were sexually assaulted abused by male correctional lieutenants and/or male . . . subordinates and such abuse was kept silent by the male correctional lieutenants . . . because they were protecting themselves and/or their . . . subordinates ("code of silence").

Whorton described the risks entirely in terms of the opportunities for misconduct inherent in the correctional lieutenant role:

> male correctional lieutenants would have the opportunity to place male correctional subordinates in situations lending themselves to sexual misconduct with female inmates. . . . Male correctional lieutenants would have the opportunity not to take action against male correctional subordinates that sexually abused female inmates. . . . male correctional lieutenants would have the opportunity to allow contraband to enter SNWCF . . . in exchange for sexual favors.

Female correctional lieutenants, according to Whorton,

> are more inclined to monitor and discipline the wrongful conduct of correctional subordinates and to take steps of prevention with respect to female inmates as their very nature, womanhood, is more conducive to dealing with the complexities and differences of female inmates.

Crawford also testified that she wanted correctional lieutenants who

> understand[ ] management of women. I think that women do have an innate ability to manage women. . . . To understand[ ] some of the emotional outbreaks. . . . With women—I don't believe that they can be manipulated . . . I just believe [women] are

more patient. They're probably more maternal. . . . they have an instinct and an innate ability to discern what is real and what isn't. . . . the female officers were able to better discern, you know, what's really happening here.

**[10]** From this panoply of explanations, it appears that NDOC administrators sought to "reduce the number of male correctional employees being compromised by female inmates," and that they believed the gender restriction on shift supervisors would accomplish this because (1) male correctional lieutenants are likely to condone sexual abuse by their male subordinates; (2) male correctional lieutenants are themselves likely to sexually abuse female inmates; and (3) female correctional lieutenants possess an "instinct" that renders them less susceptible to manipulation by inmates and therefore better equipped to fill the correctional lieutenant role.[5]

**[11]** The first theory fails because NDOC has not shown that "all or nearly all" men would tolerate sexual abuse by male guards, or that it is "impossible or highly impractical" to assess applicants individually for this qualification. *Boeing*, 843 F.2d at 1214. As to the second theory, there is no "basis in fact," *Dothard*, 433 U.S. at 335, for believing that individuals in the correctional lieutenant role are particularly likely to sexually abuse inmates. The third theory—and, to a signifi-

---

[5]NDOC also suggests that privacy and rehabilitation were among the "factors . . . considered important" in implementing the gender restriction. Neither in its briefs nor at oral argument, however, was NDOC able to direct the court to any evidence that Crawford or other administrators actually considered privacy or rehabilitation in developing the policy. This void is not surprising, as it is the guards who have direct daily contact with the inmates, not the correctional lieutenants. As noted, NDOC, in a separate policy not here challenged, restricts the number of front line guards in female prisons. As there is no evidence in this record to indicate that concern about privacy or rehabilitation was a basis for the decision to preclude men from serving in the supervisory positions, we do not consider those rationales in our BFOQ analysis.

cant degree, the first two—relies on the kind of unproven and invidious stereotype that Congress sought to eliminate from employment decisions when it enacted Title VII.

We begin our analysis by surveying the decisions applying the BFOQ exception in the prison context. *Dothard*, the only Supreme Court case on the subject, concerned a "peculiarly inhospitable" maximum security prison for men where conditions were so atrocious as to be "constitutionally intolerable," and "a substantial portion of the inmate population [was] composed of sex offenders mixed at random with other prisoners." 433 U.S. at 334, 336. In the context of this extreme environment, the Supreme Court upheld a regulation prohibiting women from working in "positions requiring continual close physical proximity to inmates," *id.* at 325, finding "[m]ore [ ] at stake . . . than an individual woman's decision to weigh and accept the risks" of working in "a prison system where violence is the order of the day." *Id.* at 335-36. The Court found "a basis in fact for expecting that sex offenders who have criminally assaulted women in the past would . . . do so again if access to women were established within the prison." *Id.* at 335. "The likelihood that inmates would assault a woman because she was a woman would pose a real threat to . . . the basic control of the penitentiary." *Id.* at 336.

As the Court later noted, "[s]ex discrimination was tolerated [in *Dothard*] because sex was related to the guard's ability to do the job—maintaining prison security." *Johnson Controls*, 499 U.S. at 202. In other words, *Dothard*'s finding of a BFOQ was premised on a level of violence among inmates atypical even among maximum security facilities. *See Gunther v. Iowa State Men's Reformatory*, 612 F.2d 1079, 1085 (8th Cir. 1980) (distinguishing *Dothard*'s finding of a BFOQ, which was premised on the prison's "rampant violence and inhuman conditions," as inapplicable to a medium security institution) (quotation omitted), *overruled on other grounds by Kremer v. Chem. Constr. Corp.*, 456 U.S. 461 (1982).

Appellate courts, including this court, have followed *Dothard* in requiring prison administrators to identify a concrete, logical basis for concluding that gender restrictions are "reasonably necessary."[6] 42 U.S.C. § 2000e-2(e)(1). In *Everson v. Michigan Department of Corrections*, 391 F.3d 737 (6th Cir. 2004), the Sixth Circuit upheld a gender restriction imposed by the Michigan Department of Corrections (MDOC) to eradicate "rampant sexual abuse of female prisoners." *Id.* at 739. MDOC had "pledged . . . to minimize access to secluded areas and one-on-one contact between male staff and female inmates" pursuant to settlement of two lawsuits, one brought by the United States Department of Justice, alleging that the failure to protect female inmates from ongoing sexual abuse violated their constitutional rights. *Id.* at 743. To effectuate the settlement agreements, MDOC employed only female guards in the housing units of women's prisons. MDOC data showed that most allegations of sexual abuse, and all of the sustained allegations, involved male employees, and that sexual abuse occurred most frequently in the housing units. This data, the court held, "established that the exclusion of male [guards] will decrease the likelihood of sexual abuse." *Id.* at 755.

In *Henry v. Milwaukee County*, 539 F.3d 573 (7th Cir. 2008), a juvenile detention center decided to staff each housing "pod" with at least one guard of the same sex as the juveniles housed on that pod, to achieve a "direct role model/mentoring form of supervision." 539 F.3d at 583. During the day, one of the two guards on each male "pod" could be female, but the sole night shift slot on each pod had to be staffed by a man. The Seventh Circuit accepted the administrator's "professional judgment" that same-gender mentoring

---

[6]Judgments by prison administrators that "are the product of a reasoned decision-making process, based on available information and experience," are entitled to some deference. *Robino*, 145 F.3d at 1110 (quoting *Torres v. Wis. Dep't. of Health & Social Servs.*, 859 F.2d 1523,1532 (7th Cir. 1988)).

was "necessary to achieve the [facility's] mission of rehabilitation." *Id.* Yet, the court found no factual support for the administrator's conclusion that the program's effectiveness required same-sex staff at all times, including on the night shift, when the juvenile inmates were sleeping. *Id.*

In *Robino*, we held that even had the gender-based restriction on assignments been actionable under Title VII, it fell within the BFOQ exception. The prison, based on "a study conducted by a specially appointed task force in compliance with an EEOC settlement agreement," designated as female-only those posts that "require[d] the [guard] on duty to observe the inmates in the showers and toilet areas . . . or provide[d] unsupervised access to the inmates." 145 F.3d at 1110-11. Because "a person's interest in not being viewed unclothed by members of the opposite sex survives incarceration," we held that protecting inmate privacy and preventing sexual misconduct warranted the restriction. *Id.* at 1111.

**[12]** These cases illustrate that, even in the unique context of prison employment, administrators seeking to justify a BFOQ must show "a high correlation between sex and ability to perform job functions." *Johnson Controls*, 499 U.S. at 202. Moreover, the particular staffing restriction at issue must match those "job functions" with a high degree of specificity to be found reasonably necessary. *See id.* (noting that in *Dothard* the Court "refused to allow employers to use sex as a proxy for strength although it might be a fairly accurate one"); *Robino*, 145 F.3d at 1111 (concluding that guard's gender directly affected female inmates' privacy concerns). In *Henry*, for example, the application of the gender restriction on the night shift would not address privacy concerns, as "the vast majority of the time that the juveniles were unclothed occurred during [ ] daytime shifts" when women were permitted to staff the pods, 539 F.3d at 582, and was not justified by the mentoring objective because "the opportunity . . . to interact with the juveniles on the [night] shift [wa]s very minimal." *Id.* at 585.

Applying this "high correlation" requirement, NDOC's first rationale for restricting the supervisory correctional lieutenant positions to women cannot suffice. Crawford's testimony suggests that because the supervisors employed by CCA were male and had failed to prevent sexual abuse, NDOC was entitled to conclude that men as a class were incapable of adequately supervising front line staff in female prisons. While we must defer to the reasoned judgment of prison administrators, *see Robino*, 145 F.3d at 1110, CCA's acknowledged leadership failure falls far short of providing "a factual basis for believing that all or substantially all [men] would be unable to safely and effectively perform the duties of the job," or that it would be "impossible or highly impracticable to determine job fitness"—here, the ability to enforce workplace rules prohibiting sexual misconduct—"on an individualized basis." *Williams v. Hughes Helicopters, Inc.*, 806 F.2d 1387, 1391 (9th Cir. 1986).[7] The fundamental switch in operational responsibility to NDOC, moreover, made any inference from the experience under CCA's extremely poor management all the weaker.

NDOC's second rationale fares no better. There is no evidence indicating that any correctional lieutenant at SNWCF had sexual relationships with an inmate.[8] In contrast, in *Everson*, copious data about the actual incidence of sexual abuse in Michigan's women's prisons supported the conclusion that the gender restriction on guards in the housing units would be

---

[7]*Williams* applied the BFOQ exception to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623(f)(1), *Williams*, 608 F.2d at 1389, which "tracks the BFOQ provision in Title VII." *Johnson Controls*, 499 U.S. at 201.

[8]NDOC's brief asserts that "Crawford discovered that many of the correctional employees compromised at SNWCF were males in supervisory positions." The citation to the record, however, shows that the "compromised" men in supervisory roles were "the individuals who alleged that they did not know anything about the drugs, alcohol and sex." Correctional lieutenants at SNWCF may have turned a blind eye to sexual abuse, but nothing in the record suggests they committed it themselves.

effective. 391 F.3d at 755. In *Robino*, prison administrators used "a study by a specially appointed task force" and "an extensive inventory of post duties" to limit the gender restriction to those posts that "provide[d] unsupervised access to the inmates." 145 F.3d at 1111. NDOC, however, offers neither data nor logical inferences about the opportunities for abuse inherent in the correctional lieutenant position to support the restriction.

In fact, the one substantiated case of sexual abuse Crawford mentioned was the front line guard who impregnated an inmate, yet NDOC continues to employ men in thirty percent of these positions. *See Everson*, 391 F.3d at 761 ("[n]either the district court nor the plaintiffs have explained how redeployment of female supervisors to the housing units [the alternative advocated by the plaintiffs,] would cure problems stemming from the very presence of male [guards] in the housing units."). When asked why the complete prohibition on the hiring of men was limited to correctional lieutenants, Crawford stated, "We did not want to go globally on this. We wanted to be specifically, what can we do to bring this thing under control . . . ? And it was the recommendation that we just look at . . . not the line level, but the supervisor level." This explanation falls short of the "reasoned decision-making process, based on available information and experience," *Robino*, 145 F.3d at 1110, that can support a BFOQ.[9]

---

[9]NDOC points to a report by the National Institute of Corrections (NIC) as evidentiary support for the claim that same-sex supervision "will likely decrease the number" of claims of sexual abuse. However, the NIC report's recommendation as to "supervision" clearly refers to the supervision of inmates by guards, not of guards by management employees. *See-* BARBARA BLOOM ET AL., GENDER-RESPONSIVE STRATEGIES: RESEARCH, PRACTICE, AND GUIDING PRINCIPLES FOR WOMEN OFFENDERS at 120 (National Institute of Correction, 2003) ("Same sex supervision lessens the likelihood of sexual misconduct . . . [t]he most visible claims [of sexual misconduct] are those brought against males who are supervising female inmates."). The report provides no support for the decision to eliminate male correctional *lieutenants* while continuing to hire men in thirty percent of the front-line guard positions. (We do not mean to suggest that NDOC's gender restriction would have met the BFOQ standard if it compassed all SNWCF's correctional officer positions, as the issue is not before us.)

Even if there were a factual basis to believe that any correctional lieutenant sexually abused any inmate, there is no basis to presume that sexual abuse, by correctional lieutenants or by guards with their supervisors' tacit permission, would continue after the state resumed control over the prison. CCA's lax oversight provided male correctional lieutenants "the opportunity not to take action against male correctional subordinates that sexually abused female inmates." That opportunity cannot be presumed to exist after the wholesale change of SNWCF's leadership, designed precisely to cure wholesale management defects going well beyond the sexual abuse issue.

To hold otherwise would be to absolve NDOC from their fundamental responsibility to supervise their staff, from wardens to front-line guards. In *Dothard*, the inmates' violent behavior, which prison administrators could not directly control, rendered the gender restriction reasonably necessary. Neither *Dothard* nor any of the cases on which NDOC relies support finding a BFOQ based on the bald assertion that it would be "impossible . . . to ensure that any given male correctional lieutenant will take action to prevent and stop sexual misconduct." Where, as here, the problem is *employee* behavior, prison administrators have multiple resources, including background checks, prompt investigation of suspected misconduct, and severe discipline for infractions, to ensure compliance with institutional rules.

NDOC has not demonstrated that these alternative approaches—including the Inspector General's suggestion of enhanced training for both supervisors and front-line guards—are not viable. *See Henry*, 539 F.3d at 581 ("Milwaukee County offered no reasons why the numerous alternatives to same-sex staffing . . . would not have mitigated any concern."); *Forts v. Ward*, 621 F.2d 1210, 1216 (2d Cir. 1980) (upholding a district court order "prohibit[ing] the stationing of male guards at locations where inmates could be viewed . . . unclothed" but reversing a ban on male guards during the

night shift because inmate privacy could be protected by means that did not infringe on employment rights); *Gunther*, 612 F.2d at 1087 (holding that gender was not a BFOQ where administrative changes in job functions and procedures would adequately protect inmate privacy). Whorton's conclusory assertion that "more training is not a cure for this serious issue" is, without more, wholly inadequate. Even the NIC report, on which NDOC purportedly relied, recommends "improving training programs to heighten staff awareness of [sexual abuse] and its consequences."

[13] Disturbingly, in suggesting that all men are inherently apt to sexually abuse, or condone sexual abuse of, female inmates, NDOC relies on entirely specious gender stereotypes that have no place in a workplace governed by Title VII. NDOC's third theory, that women are "maternal," "patient," and understand other women, fails for the same reason. To credit NDOC's unsupported generalization that women "have an instinct and an innate ability to discern . . . what's real and what isn't" and so are immune to manipulation by female inmates would violate "the Congressional purpose to eliminate subjective assumptions and traditional stereotyped conceptions regarding the . . . ability of women to do particular work." *Rosenfeld v. S. Pac. Co.*, 444 F.2d 1219, 1225 (9th Cir. 1971); *see also Diaz*, 442 F.2d at 386 (rejecting an airline's contention that "the special psychological needs of its passengers . . . are better attended to by females"). "The harmful effects of occupational cliches," *Gerdom v. Continental Airlines*, 692 F.2d 602, 607 (9th Cir. 1982), are felt no less strongly when invoked as a basis for one gender's unique suitability for a particular job than when relied on to exclude members of that sex from employment. Simply put, "we are beyond the day when an employer could . . . insist[ ] that [employees] matched the stereotype associated with their group." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989).

[14] A BFOQ can be established only by "objective, verifiable requirements [that] concern job-related skills and apti-

tudes." *Johnson Controls*, 499 U.S. at 201. Though the professional judgment of prison administrators is entitled to deference, *see Robino*, 145 F.3d at 1110, "[t]he refusal to hire a [man] because of [his] sex based on assumptions of the comparative employment characteristics of [men] in general" will not support a BFOQ. 29 C.F.R. § 1604.2(a)(1); *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724-25 (1982) ("[A] gender-based classification . . . must be applied free of fixed notions concerning the roles and abilities of males and females."); *Dothard*, 433 U.S. at 333 ("[I]t is impermissible under Title VII to refuse to hire an individual woman or man on the basis of stereotyped characterizations of the sexes."); *Torres*, 859 F.2d at 1527 ("Myths and purely habitual assumptions about a woman's or a man's inability to perform certain kinds of work are no longer acceptable reasons for refusing to employ qualified individuals.") (quoting *City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 (1978) (brackets omitted)); *Fernandez v. Wynn Oil Co.*, 653 F.2d 1273, 1276 (9th Cir. 1981) ("[S]tereotypic impressions of male and female roles do not qualify gender as a BFOQ.").

**[15]** In sum, NDOC has not met its burden of showing "a basis in fact," *Dothard*, 433 U.S. at 335, for concluding that all male correctional lieutenants would tolerate sexual abuse by their subordinates; that all men in the correctional lieutenant role would themselves sexually abuse inmates; or that women, by virtue of their gender, can better understand the behavior of female inmates. Nor has it refuted the viability of alternatives that would achieve that goal without impeding male employees' promotional opportunities.

## CONCLUSION

**[16]** Restricting employment opportunity on the basis of gender can be justified by the need to counter uncontrollably violent inmate behavior, as in *Dothard*. But this case concerns the behavior of employees, not inmates. Precluding men from

serving in supervisory positions in women's prisons is not a substitute for effective leadership and enforcement of workplace rules. As NDOC's correctional lieutenant restriction denied promotional opportunities on the basis of sex and was neither "de minimis" nor "reasonably necessary to the normal operation" of SNWFC, 42 U.S.C. § 2000e-2(e)(1), it violated Title VII. The district court's order granting summary judgment to the defendants is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this opinion.